UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
CREDIT SUISSE SECURITIES (USA) LLC,   :   No. 07 Civ. ___
                   Petitioner,   :
    -against-   :
                             :   **PETITION FOR INJUNCTIVE**
JOHN L. SULLIVAN II,   :   **RELIEF PENDING ARBITRATION**
                   Respondent.   :
------------------------------------------------------------ x

       Petitioner Credit Suisse Securities (USA) LLC ("Credit Suisse") petitions this Court for a temporary restraining order and a preliminary injunction pending arbitration compelling Respondent John L. Sullivan II ("Respondent") to: (1) honor contractual commitments obligating him to: (a) provide sixty (60) days' notice prior to terminating his employment with Credit Suisse; (b) refrain from directly or indirectly engaging in competitive activity for thirty (30) days after termination of his employment; and (c) refrain from directly or indirectly soliciting Credit Suisse clients and employees for sixty (60) days after termination of his employment; and (2) return and refrain from using or disclosing Credit Suisse's confidential and trade secret information.

## FACTUAL ALLEGATIONS

### The Parties

    1.    Petitioner Credit Suisse is, and at all relevant times has been, one of the world's leading financial institutions and a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business at 11 Madison Avenue, New York, New York. Credit Suisse is engaged in the business of selling investment products and providing financial services to its clients.

2.  Upon information and belief, Respondent is a resident and citizen of the state of California. Respondent is employed as a Director in the San Francisco office of Credit Suisse's Private Banking USA Group ("Private Banking") and registered with the NASD (now known as FINRA) as a broker employed by Credit Suisse.

**Jurisdiction and Venue**

3.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 inasmuch as the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000.00.

4.  Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(a) inasmuch as a substantial part of the events or omissions giving rise to the claims herein occurred in this district. Moreover, as set forth fully below, the parties' arbitration agreement calls for arbitration to be held in the New York City metropolitan area under New York law.

**Respondent's Role as a Trusted Credit Suisse Executive**

5.  Credit Suisse's claims arise from Respondent's sudden purported resignation of his employment with Credit Suisse on September 27, 2007, with no notice, his subsequent affiliation with a direct competitor of Credit Suisse, Jefferies, and his solicitation of employees and clients on behalf of Jefferies in violation of his express contractual and common law obligations.

6.  Private Banking provides investment advisory and portfolio management services for clients throughout the United States and the world. The client base for Private Banking is necessarily limited and includes high net worth individuals and smaller institutions, such as hedge funds, foundations and endowments. The nature of Private Banking's business requires the exercise of discretion to manage substantial investment portfolios. Thus, the trust and confidence of its clients are crucial to Private Banking's business. Indeed, client relationships

2

are the lifeblood of the Private Banking business.

7. Respondent is a Director and joined Credit Suisse in December 1999. Respondent was highly-compensated, earning almost $350,000 in 2006 alone.

8. While employed in Private Banking, Respondent was responsible for Private Banking client accounts containing over $125 million in assets under management. On an annualized basis, these accounts presently generate close to $1,000,000 in revenue for Credit Suisse. Credit Suisse placed significant Credit Suisse client relationships into Respondent's care as a trusted Private Banking employee, and tens of millions of dollars of Private Banking client assets that Respondent managed were developed by Credit Suisse independent of Respondent's efforts.

9. Private Banking provides investment advisory and portfolio management services for clients throughout the United States and the world. The client base for Private Banking is necessarily limited and includes high net worth individuals and smaller institutions, such as hedge funds, foundations and endowments. The nature of Private Banking's business requires the exercise of discretion to manage substantial investment portfolios. Thus, the trust and confidence of its clients are crucial to Private Banking's business. Indeed, client relationships are the lifeblood of the Private Banking business.

10. Significant Credit Suisse client relationships serviced by Respondent were developed by Credit Suisse without Respondent's assistance, and placed into Respondent's care as a trusted Private Banking employee, or were developed while Respondent was at Credit Suisse with Credit Suisse's support. Indeed, based on Respondent's own figure before coming to Credit Suisse he serviced only approximately $39 million in client assets, whereas as of the date of his notice of resignation he serviced Credit Suisse client assets of over $125 million. In fact, Respondent played a very little role in the establishment of the client relationships representing

approximately $60 million.

11. Respondent was able to develop and/or maintain his relationships with the clients he serviced on Credit Suisse's behalf due to support provided by Credit Suisse. Credit Suisse provided Respondent with ongoing training and paid for and sponsored his registration with the NASD. Credit Suisse also provided Respondent with office facilities, computer equipment, secretarial services, sales assistants, research, operational systems, use of departmental experts and services, inventory, and the benefit of Credit Suisse promotional marketing and sales support. Credit Suisse's support of Respondent allowed him to grow the Credit Suisse client assets under his management and, consequently, the compensation he received.

12. In further support of Respondent's ability to develop relationships with Credit Suisse's valuable clients, Credit Suisse paid Respondent's associated expenses and reimbursed him for travel and entertainment expenses associated with business development. Indeed, his travel and entertainment expenses, paid for by Credit Suisse, amounted to approximately $15,000 for 2006 and 2007 alone.

13. It is standard industry practice, as well as the policy of Credit Suisse, that clients are clients of the firm, not of an individual registered representative (alternatively, "broker"). Credit Suisse's clients expect Credit Suisse, rather than an individual broker, to protect their personal investments and other financial information.

**Respondent's Access to Sensitive Information**

14. As part of his job, Respondent necessarily had unfettered access to some of the most sensitive information concerning Credit Suisse, its business and its clients. All brokerage houses have established draconian measures to safeguard client confidences and client information and to prevent the dissemination or misappropriation of such information, not only because of its value to the brokerage house, but, as importantly, because the clients demand and

expect that their privacy will be safeguarded.

15.  By virtue of his work for Private Banking, Respondent was privy to a vast amount of information concerning the clients he serviced, including the names, addresses, and telephone numbers of those clients, as well as the clients' investment profiles, investment returns, risk tolerances and liquidity, business strategy information, research, and other sensitive non-public information. This information is compiled with great time, effort, and expense. Moreover, historic information on clients, such as their investment history, takes years to create and allows the firm to approach clients with an understanding of their goals.

16.  Such client information—including client lists containing names, addresses, contact information, and account numbers of our clients— is highly proprietary and confidential because the information would provide a competitor with a pronounced advantage in attempting to obtain business from the clients at Credit Suisse's expense. All such information requires much effort and expense on the part of Credit Suisse to acquire and maintain.

17.  Credit Suisse maintains company policies advising employees of their obligations to safeguard the company's assets and confidential and proprietary information, both during employment and following departure from Credit Suisse. To further maintain the confidentiality of such information, Credit Suisse protects its physical offices by electronic security systems as well as conventional locks. It safeguards its electronic data and information by means of electronic security measures. Access to account information and other financial information about a specific customer is limited to the registered representatives responsible for managing that customer's investment accounts. Access to electronic data and information is by individual password only. No employees of Credit Suisse are authorized to keep or maintain personal records concerning customers or to take any other customer information with them when they resign from employment.

18. Of particular concern is the fact that Respondent's intended new employer, Jefferies, is in the same business as Credit Suisse, providing retail brokerage services to clients and, in particular, high-net-worth clients. Jefferies is a direct competitor of Credit Suisse. On information and belief, Respondent will be performing the same or similar role at Jefferies as he has at Credit Suisse and will inevitably compete with Credit Suisse and use and disclose the confidential information that he obtained at Credit Suisse.

**Respondent's Notice, Non-Competition, and Non-Solicitation Obligations**

19. On September 29, 2000, Respondent entered into an agreement with Credit Suisse, under which he was paid $75,000 in the form of a forgivable loan in exchange for agreeing to certain restrictive convents (the "Loan Agreement"). Specifically, under the terms of the Loan Agreement, Respondent agreed to (a) provide thirty (30) days' notice of his intent to terminate his employment; and (b) for a period of thirty (30) days after the termination of his employment, to refrain from engaging in Competitive Activity or Solicitation, defined, respectively, as follows:

> "Competitive Activity" means, with respect to any participant, that such participant enters into any affiliation with any . . . business entity or enterprise which engages in any activity which is the same as, or similar to, or in competition which, a business activity of [Credit Suisse] and/or its parents, subsidiaries, and affiliates . . . ; and
>
> "Solicitation" means with respect to a participant whose employment is terminated that such participant solicits or endeavors to entice away from [Credit Suisse], or otherwise interferes with the relationship of [Credit Suisse] with any person who is employed or engaged by [Credit Suisse] as an employee, consultant or independent contractor or who was associated with [Credit Suisse] as a customer or client at any time during the 6 month period preceding such termination of employment with whom the participant had dealings and /or management responsibilities.

(See Timbrell Declaration at Exh. B.)

20. Per the Loan Agreement, Credit Suisse fully forgave Respondent's loan as of July 1, 2004. Accordingly Respondent has now received $75,000—free and clear—in exchange for

6

agreeing to be bound by his Notice, Non-solicit, and Non-compete obligations. Respondent's intended new employer, Jefferies, is in the same business as Credit Suisse, providing retail brokerage services to clients and, in particular, high-net-worth clients. Jefferies is a direct competitor of Credit Suisse. On information and belief, Respondent will be performing the same or similar role at Jefferies as he has at Credit Suisse and will inevitably compete with Credit Suisse.

21. The Credit Suisse U.S. Employees Handbook (the "Handbook") requires all Credit Suisse employees at the level of Director, such as Respondent, to provide at least sixty (60) days' notice before terminating their employment ("Notice Provision"). The Handbook also obligates Credit Suisse to provide all covered employees, including Respondent, thirty (30) days' notice before terminating their employment for any reason other than for cause. Additionally, the Handbook contains a non-solicitation policy ("Non-Solicit Provision") under which for sixty (60) days after the effective termination of their employment, Directors, such as Respondent, are prohibited from:

> (A) directly or indirectly soliciting, inducing or encouraging any employee of [Credit Suisse] and its parents and affiliates (the "Group"), or any consultant or independent contractor providing services to the Group, to leave the Group or to join or perform services for any other company; or
>
> (B) directly or indirectly soliciting, inducing or encouraging any entity or person who is a customer or client of the Group to cease to engage the services of the Group in order to use the services of any entity or person that competes directly with a material business of the Group, where the identity of such customer or client, or the customer or client's need or desire for or receptiveness to services of a type offered by the Group, is known by the employee as a result of his or her employment with the Group.
>
> (See Timbrell Declaration at Exh. C.)

7

22. In agreeing to follow the terms of the Handbook, Respondent also agreed to safeguard Credit Suisse's confidential information. The Handbook specifically provides that:

> "all information that is confidential or proprietary to [Credit Suisse] must be used solely in connection with an employee's official capacity at [Credit Suisse]. Such information must never, under any circumstances, be used for personal gain or for the gain of any third party, including members of the employee's family or household. After they leave the Firm, employees are prohibited from using any of the Firm's confidential and proprietary information for any purpose and from disclosing such information to any person. Information may be confidential or proprietary to [Credit Suisse] whether it is contained in written materials such as memoranda or other documents, is generated or stored in electronic form or magnetic form, or is in unrecorded form."

See id.

23. During his employment with Credit Suisse, Respondent annually agreed to be bound by and follow all of Credit Suisse's employment-related policies, including those set forth in the Handbook. Respondent most recently indicated his agreement to be bound by Credit Suisse's policies on November 28, 2006, when he electronically signed a certification to that effect.

24. In addition, in 2006 and 2007, Respondent was issued certain share awards pursuant to the Credit Suisse Group Master Share Plan. The terms and conditions of the awards are stated in award certificates (the "Award Certificates"). Pursuant to the Award Certificates, Respondent also is obligated to provide sixty (60) days written notice of his resignation and to refrain from soliciting clients and employees for sixty (60) days after his termination of employment.

25. To sum up, Respondent was bound by three separate and independently enforceable contracts that collectively bound him to (a) provide sixty (60) days' notice of his intention to resign, (b) for an additional thirty (30) days post termination of his employment, to

refrain from competing with Credit Suisse and (c) for an additional sixty (60) days after termination of his employment, to refrain from directly or indirectly soliciting Credit Suisse's clients and employees. These covenants thus apply for a grand total of one hundred twenty (120) days, and they are critical to Credit Suisse's business because they provide the firm with a limited window of time in which to attempt to retain business during an extremely sensitive period of time when the client representative responsible for maintaining accounts for Credit Suisse has suddenly switched teams and is now aggressively trying to convince the accounts to depart Credit Suisse. Ultimately, the clients may choose to have their accounts managed by whomever they wish, but Credit Suisse and Respondent entered into these limited covenants in an effort to level the playing field at a time when, in this industry, it is well understood that the departing relationship manager has an unfair advantage because he or she can leverage the personal relationships that they developed with clients at Credit Suisse's expense while the firm is attempting to introduce new relationship managers in an effort to retain business.

26.     Respondent received significant consideration in exchange for agreeing to comply with the restrictive covenants: (1) he received a $75,000 payment; (2) he received an award of potentially lucrative Credit Suisse shares; (3) he was permitted to remain in Credit Suisse's employ, where he was paid several hundred thousand dollars per year (among other benefits and privileges); (4) Credit Suisse agreed to provide Respondent with thirty (30) days' notice of its intention to terminate him other than for cause, or to pay him the base compensation that he would have earned in thirty (30) days, in the event Credit Suisse decided not to provide 30 days' notice; and (5) in the event he resigned, Respondent was entitled to remain on the Credit Suisse payroll and to receive his base salary and commissions during his 60-day notice period. Moreover, on information and belief, Respondent's new employer, Jefferies, has similar restrictive covenants that he will be subject to while in Jefferies employ. Presumably,

9

Respondent has told Jefferies that he will follow their restrictive covenants – thus undercutting any possible argument that Respondent could raise in support of his decision to flout his covenants with Credit Suisse.

**Respondent's Departure from Credit Suisse**

27.     On September 27, 2007, Respondent abruptly purported to resign and accept employment with Jefferies in blatant violation his obligations (a) to provide sixty (60) days' notice before terminating his employment; (b) to refrain from engaging in competitive activity for thirty (30) days following the termination of his employment; and (c) to refrain from soliciting any of Credit Suisse's clients or employees for sixty (60) days following the termination of his employment.

28.     Respondent and his sales assistant, Anne Dietrich, served their notices of resignation on September 27, 2007, after Carey Timbrell, Respondent's manager, had left for the day. The coordinated nature of their departure was made clear by Ms. Dietrich, who informed Credit Suisse that she was leaving specifically to go with Respondent. When notified of the resignations, Mr. Timbrell immediately called Respondent to ask him about the resignations, and, most importantly, to seek his assurances that he would comply with his ongoing obligations to Credit Suisse. Mr. Timbrell specifically reminded Respondent of his restrictive covenants, and Respondent replied by representing to Mr. Timbrell – unequivocally – that he understood he was bound by the restrictive covenants and he promised he would abide by them.

29.     On September 28, 2007, Credit Suisse sent Respondent a letter reminding him that he is obligated to abide by the Notice, Noncompete, and Non-Solicit provisions and that he is not permitted to disclose or cause to be disclosed any of Credit Suisse's confidential or proprietary information. (See Timbrell Declaration at Exh. G.) On the same day, Credit Suisse also wrote to Jefferies to inform them of Respondent's covenants with Credit Suisse, and Credit

Suisse's understanding that Respondent would continue to comply with the covenants. (See Timbrell Declaration at Exh. I.) Consistent with Respondent's representations, Jefferies further represented to Credit Suisse's counsel that Respondent was not working at Jefferies at that time and led Credit Suisse to believe that he would not do so, pending further discussions.

30. Unfortunately, late in the day on the following Monday, October 1, 2007, Jefferies informed Credit Suisse that, despite Respondent's multiple signed contracts for which he had been paid substantial sums, and his assurances and Jefferies' assurances, Respondent had in fact commenced work and was actively soliciting Credit Suisse clients. A subsequent attempt to work out an agreement short of litigation failed, largely because, in a dramatic about-face, Respondent flatly refused to comply at all with his restrictive covenants with Credit Suisse.

31. Prior to Respondent's resignation, Respondent used his Credit Suisse email account to solicit a current Credit Suisse employee (other than Ms. Dietrich) and also solicited at least two important Credit Suisse clients to move with him to Jefferies. The fact that these emails were sent before Respondent had even notified Credit Suisse of his intent to resign, while he remained a trusted Director of Credit Suisse, demonstrates a total abrogation of his basic fiduciary obligations as an employee, not to mention his specific contractual obligations to Credit Suisse. That kind of conduct, coupled with his misrepresentation, demonstrates that Respondent has every intention of trying to take just as much business as he possibly can, and to solicit employees from Credit Suisse, relying on the confidential information that he was sworn to protect, with absolutely no regard for any duties that he owes to Credit Suisse.

32. Of at least equal concern, is the fact that on the day Respondent and Ms. Dietrich resigned together, Ms. Dietrich made several trips, with Credit Suisse client account files in hand, between her desk and in the direction of the copy room. Such trips were unusual and, particularly given the timing, may be evidence of Respondent's misappropriation of confidential

11

materials and/or information for use at Jefferies. Moreover, Respondent entered Credit Suisse offices at regular intervals on September 25, 2007 – two days before resigning – between the hours of 6:30 p.m. and 10 p.m. Given that the office is typically empty by 5:30 p.m., and the fact that the Jefferies office is located on the very floor below Credit Suisse, such irregular office entries also may be evidence of Respondent's misappropriation of confidential materials and/or information for use at Jefferies.

33. Neither Respondent nor Ms. Dietrich is authorized to take confidential information or materials from Credit Suisse. Indeed, Ms. Dietrich is subject to the same confidentiality obligations as Respondent, as she certified compliance with the Handbook and is also subject to a confidentiality agreement contained in her offer letter, in addition to her fiduciary obligations to Credit Suisse not to misuse firm materials. If Respondent and Ms. Dietrich are permitted to retain such information, or, worse, use it at their new employer, Credit Suisse's and its clients' sensitive information will continue to remain unprotected, and will more than likely be misused. Indeed, it is inconceivable that Respondent and Ms. Dietrich would take information that they did not intend to use.

34. By resigning without notice, commencing employment with Jefferies, soliciting clients and employees, and, in all likelihood, misappropriating confidential information, Respondent violated internal Credit Suisse policies that he agreed to follow as an express condition of his employment. The Notice, Non-Compete, Non-Solicit and Confidentiality provisions that Respondent agreed to are reasonable and narrowly tailored to protect Credit Suisse's legitimate business interest in retaining its clients and protecting its goodwill in the marketplace. Moreover, such covenants are standard in this industry, and are recognized as being necessary to prevent firms from suffering irreparable harm when trusted employees elect to depart for a competing position.

**Respondent's Arbitration Agreement**

35.     Since 1998, Credit Suisse has maintained an Employment Dispute Resolution Program (the "EDRP"). By its express terms, the EDRP is the exclusive means for resolving any and all "Employment-Related Claims" that arise between Credit Suisse and its employees and former employees.

36.     "Employment-Related Claims" are defined in the EDRP to include "[a]ll present and future claims against [Credit Suisse] by an employee" that "relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing, and . . . assert the violation or infringement of a legally protected right."

37.     The EDRP provides that Employment-Related Claims shall be resolved through a three-step process. The first step requires the aggrieved party to file an internal grievance, if appropriate. If the grievance is not resolved, the party may initiate non-binding mediation before a mediator supplied by JAMS. If mediation is not successful, the employee or Credit Suisse may initiate arbitration before one of three arbitration providers: the American Arbitration Association, the CPR Institute for Dispute Resolution, or JAMS. Absent a mutual agreement to arbitrate elsewhere, arbitration under the EDRP must take place in the New York metropolitan area, and the arbitrator must apply New York law.

38.     All United States-based Credit Suisse employees are required as a condition of employment to agree to abide by the EDRP. Respondent expressly agreed to abide by EDRP repeatedly, as evidenced by his signature in 2001 and later compliance certifications. (See Timbrell Declaration at Exhs. D, L.)

39.     On October 3, 2007, in wake of Respondent's blatant violation of his Loan Agreement, the Credit Suisse U.S. Employee's Handbook's policies, the provisions of the Credit

13

Suisse Share Plan, and Respondent's duty of loyalty to Credit Suisse, Credit Suisse served requests for mediation and arbitration upon Respondent pursuant to the EDRP. These claims are within the scope of the EDRP as they arise from Respondent's employment with Credit Suisse and the termination thereof. Credit Suisse's claims are thus arbitrable under the EDRP.

**Irreparable Injury**

40.     Respondent's improper conduct will inevitably cause irreparable harm and damage to Credit Suisse's business and goodwill for which there is no adequate remedy at law. Respondent's wrongful acts, if allowed to continue, will seriously compromise years of substantial investment and effort by Credit Suisse in the goodwill and relationships cultivated with its customers.

41.     Credit Suisse's relations with its clients and its reputation are factors critical to its continued success. Credit Suisse now faces the potential destruction of both Credit Suisse's clients' goodwill—which Credit Suisse has spent years of effort and millions of dollars to develop—and the vast and critical potential referral of additional business.

42.     Information such as the names, addresses, telephone numbers, investment preferences, investment histories and personal details of customers is really the lifeblood of a brokerage firm such as Credit Suisse. It is only with great expense and effort, typically over a long period of time, that Credit Suisse develops relationships with such customers. Credit Suisse places employees, such as Respondent, in positions of having an opportunity to maintain and develop such relationships only with the express understanding and trust that such customers and pertinent information about them belong to the firm. Credit Suisse would be irreparably harmed if brokers, known as "Relationship Managers," such as Respondent, were not restrained from misappropriating and using such relationships and information to their own advantage and for the benefit of Credit Suisse's competitors.

43. As a result of this wrongful conduct by Respondent, Credit Suisse has suffered, and will continue to suffer, substantial and irreparable harm, including, but not limited to:

- the loss of goodwill and business reputation;
- the loss of Credit Suisse's existing and potential customers;
- the inability to enforce the restrictive covenants of other employees; and
- disclosure of Credit Suisse's confidential proprietary information and trade secrets that Respondent likely misappropriated prior to leaving Credit Suisse.

44. The damages that Credit Suisse has suffered, and will continue to suffer, are nearly impossible to calculate, especially because the losses of goodwill and client trust are nearly impossible to measure.

45. If Respondent is not prevented immediately, thoroughly and resolutely from failing to honor his contractual obligations and his common law duties to Credit Suisse, Credit Suisse (a) will be deprived of the benefits of its bargain; (b) will be put in the untenable position of demoralizing its loyal registered representatives by constantly having to police and monitor them from acting in the unlawful manner described herein; and (c) could lose a large portion of its irreplaceable intellectual property. Moreover, if relief is not given to Credit Suisse, it will be virtually impossible for Credit Suisse to convince its other loyal registered representatives that conduct such as that of Respondent is in fact unlawful and will not be tolerated.

46. Based on past experience, it will take a number of days to schedule and hold a mediation. Then, there will be an additional period of time before the arbitration is held. If during that time, Respondent is permitted to work for Jefferies or to otherwise violate his non-competition, non-solicitation and/or confidentiality obligations as set forth above, Credit Suisse will suffer further substantial irreparable harm from Respondent's direct or indirect solicitation

of Credit Suisse's clients and/or employees and likely misappropriation of Credit Suisse's confidential and proprietary client-related information.

47.     Credit Suisse lacks an adequate remedy at law to address this substantial and irreparable harm it is incurring as a result of Respondent's actions.

### PRAYER FOR RELIEF

48.     The parties' agreement to arbitrate Employment-Related Claims pursuant to the procedures set forth in Credit Suisse's EDRP, which Respondent agreed to adhere to is enforceable by this Court pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq., which authorizes this Court to enter an Order directing that arbitration proceed in the manner provided for in the arbitration agreement. *See* 9 U.S.C. § 4.

49.     Ancillary to its power under the Federal Arbitration Act to compel arbitration, this Court is empowered to issue preliminary injunctive relief to preserve the meaningfulness of arbitration by preventing a party from irreversibly altering the status quo.

50.     This Court is further authorized to grant such injunctive relief pending arbitration pursuant to 28 U.S.C. § 1651, in aid of its jurisdiction.

WHEREFORE, Credit Suisse respectfully requests that the Court issue an order:

> (a)     forbidding Respondent from accepting employment with any entity other than Credit Suisse until his resignation becomes effective on November 26, 2007, or with any competitor of Credit Suisse through December 26, 2007, when his non-competition period ends;
>
> (b)     forbidding Respondent through January 25, 2008 from directly or indirectly soliciting (i) any customer or client of Credit Suisse to transfer its business from Credit Suisse to any other person or entity or (ii) any employee of Credit Suisse or consultant or independent contractor at Credit Suisse to leave the employ or service of Credit Suisse to join or work at another entity;
>
> (c)     compelling Respondent and all those acting in concert with him to return immediately (and not later than 9 a.m. Thursday, October 4, 2007, Pacific

Standard Time) to Credit Suisse all of Credit Suisse's confidential information and trade secrets; and

(d)   granting such other and further relief as may be just and proper.

Dated: New York, New York
       October 3, 2007

CREDIT SUISSE SECURITIES (USA) LLC

*Alexander Barnard*
Alexander C.B. Barnard (AB-3181)

One Madison Avenue, 9th Floor
New York, New York 10010
(212) 325-2000

*Attorneys for Credit Suisse*
*Securities (USA) LLC*
