IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CREDIT SUISSE SECURITIES (USA)
LLC,                                    )
                                        )
                                        )
                Petitioner,             )        Civ. No. 1:07-cv-08556-JGK
                                        )
        vs.                             )
                                        )
JOHN L. SULLIVAN II,                    )
                                        )
                Respondent.             )
                                        )

### DECLARATION OF JOHN L. SULLIVAN II

JOHN L. SULLIVAN II, under penalty of perjury, declares as follows:

1.      I submit this Declaration on personal knowledge in opposition to my
former employer Credit Suisse Securities (USA) LLC's ("Credit Suisse") attempt to
prevent me from continuing to provide professional services to my clients.

2.      I am 58 years old. I live in Atherton, California with my wife and
am the sole wage earner in our family.   I served in the United States Marine Corps
from 1967 through 1970.   After receiving an honorable discharge, I completed a B.A.
in English Literature at Stanford University in 1974.

3.      December 2007 marks my 30th anniversary as a registered
representative with the New York Stock Exchange and various other exchanges. Prior
to joining Credit Suisse[1] in March 1999, I had worked for a succession of prominent
investment banking firms, primarily dealing with small institutional clients, and trusts,

---

[1] I began working for Donaldson, Lufkin & Jenrette ("DLJ") in 1999. Credit Suisse acquired DLJ in August of

foundations, and family offices of private clients. During this time I amassed a loyal and profitable clientele. I began in 1977 as an account executive for Merrill Lynch's San Jose, California office. Subsequently, I worked from 1979 through 1990 as a Senior Vice President at the San Francisco office of Lehman Brothers. From 1990 to 1996, I worked as an Associate Director in Private Client Services at the San Francisco office of Bear Stearns. From 1996 through 1998, I was a Managing Director of Private Investments at Piper Jaffray in San Francisco. From 1998 to 1999 I was the Director and Manager of the Restricted Stock Group at the San Francisco office of UBS Warburg Dillon Read.

4.    In 1999, DLJ, prior to its acquisition by Credit Suisse, recruited me precisely because it: (i) was aware of my long-standing high net worth clientele; (ii) expected that I would bring this clientele with me upon leaving UBS Warburg; and (iii) calculated it would benefit enormously from the steady stream of income my clients' commissions would generate. During my tenure at Credit Suisse, a full 80% or more of my clients consisted of clients I had amassed prior to joining CS  Another 10% of my clients consisted of family, friends, and business acquaintances whose relationships with me antedate, by many years, my affiliation with Credit Suisse. The remaining 10% of my clients consisted of Credit Suisse employees and their friends and family who asked me to manage their money while I was a Director there -- clients who I relinquished upon resigning on September 27, 2007. I was not a recipient of referrals from Credit Suisse, nor corporate assignments.

---

2000. Hereinafter I will refer to Credit Suisse and DLJ interchangeably.

5.    DLJ hired me as Vice President of Private Client Services in 1999, and I later became a Director at CS Private Banking USA.  To the best of my knowledge, upon my hiring at DLJ I did not sign an employment contract or a restrictive covenant.  If I did, DLJ certainly never informed me of such beforehand.  Likewise, in the years that followed, Credit Suisse never proffered a restrictive covenant, never required me to sign one, and never advised me that I had signed one previously.  I understand that Credit Suisse, in litigation against former employees, often cites obscure language in a compliance manual it annually asks its employees to read and sign.  This annual compliance manual is the approximate size of the San Francisco telephone book.  Notwithstanding its size, I'm not aware of any language resembling a restrictive covenant in the document.  Accordingly, if Credit Suisse has buried language in its voluminous compliance manual implying restrictions on my post-employment conduct, I believe that the clause would constitute an invalid contract of adhesion or a legal nullity.  In any event, Credit Suisse never informed me of the existence or implications of a restrictive covenant.  Furthermore, Credit Suisse never advised me to retain a lawyer to review any contract containing a restrictive covenant, and it never gave me the opportunity to consult one on my own.   In the roughly eight years I worked at Credit Suisse, not a single  representative of the firm ever warned me or otherwise suggested that if I chose to terminate my employment, Credit Suisse would seek to assert dominion over my clients or attempt to prevent me from continuing to service them.

3

6.    Only after I resigned from Credit Suisse on September 27, 2007 did I receive a threatening letter that first suggested the existence of a restrictive covenant.  On September 28, 2007, Credit Suisse sent me a letter in which the firm contends that "certain restrictive covenants" prohibit me from: (i) "working" or "performing services" for another employer for 60 days following my resignation on September 27, 2007 (until November 26, 2007); (ii) engaging in "competitive activity" for another 30 days thereafter (until December 26, 2007); and (iii) contacting my clients for another 30 days thereafter (until January 25, 2008).[2]  However, Credit Suisse does not cite or reference the purported contract or restrictive covenant upon which it bases its contentions.  In any case, I understand that California Business and Professions Code § 16600 would void any such putative non-compete clause and/or restrictive covenant.

7.    As stated above, I resigned from Credit Suisse on Thursday, September 27, 2007.  I resigned by telephone to my manager, after making unsuccessful attempts to resign to him in-person.  Thereafter, I accepted Jefferies & Co.'s offer to join its Private Client Services division as a Managing Director, in the firm's San Francisco office.

8.    When I departed the Credit Suisse office following my resignation, I left behind all original Credit Suisse documents and my client files -- completely intact as I had maintained them when I worked there.  Accordingly, I did not take (and I do

---

[2] Credit Suisse's letter identifies January 25, 2007 [sic] as the date through which I am allegedly prohibited from contacting my clients.

4

not possess) anything proprietary or confidential to Credit Suisse, or otherwise concerning Credit Suisse's business. I possess no "trade secrets" or other information proprietary to Credit Suisse. Nor do I have any information that originated with Credit Suisse or that relates to Credit Suisse accounts and employees. Indeed, there were no paper files at Credit Suisse – all files were electronic. The only materials I took with me were personal to me. These included such items as memorabilia pertaining to my service in Vietnam, documents pertaining to my membership in various organizations, my umbrella, documents pertaining to my Credit Suisse benefits, retirement, and compensation, research materials from wholesalers, and my personal notes with telephone numbers of my clients.

9.    I have not taken any steps to interfere with Credit Suisse's ability to fairly compete with me for my clients' business. Any client of mine who prefers to remain with Credit Suisse is free to do so.

10.    Both before and after resigning, I heard reports that in lawsuits commenced by it against its former brokers, Credit Suisse takes the position that the broker's clients belong to Credit Suisse, and it attempts to prevent the broker from servicing such clients. In my situation, such a position is absurd. As described above, I secured over 80% of my clientele well before I ever went to work for Credit Suisse. Another 10% arose from social, business, and familial relationships that antedate my tenure at Credit Suisse.

11.    Accordingly, Credit Suisse has no right to consider as its own the clients whom I developed and serviced, using skills that I acquired through my own

5

hard work, at my own expense, and years before I ever went to work at Credit Suisse. Credit Suisse had no prior relationship with any of my clients. If the subject clients truly were Credit Suisse's clients, the firm would have no need to sue me in an effort to prevent them from continuing to work with me at my new firm. In any event, nothing prevents Credit Suisse from competing with me for my clients' business, and such clients have every right to keep their accounts at Credit Suisse, continue working with me at my new firm, or take their business elsewhere.

12.    During the time that I was a Director at Credit Suisse, I generated substantial profits for the firm. As a result of an enormous amount of hard work, I built a strong, loyal, and lucrative client base. Credit Suisse now seeks to prevent me from servicing the substantial book of business that I previously developed. I expect that many of my clients will continue to do business with me. They are, of course, free not to do so and may decide to stay with Credit Suisse or go elsewhere.

13.    I understand that Credit Suisse may seek not only to enjoin me from soliciting my clients but also to enjoin clients from doing business with me at my new firm by precluding me from accepting their business. An injunction that precludes clients from doing business with me would cause the clients and me significant hardship. They rely upon my advice and my intimate knowledge of their portfolios and goals to make investment decisions. It would take any new financial advisor substantial time to gain the trust of these clients and the knowledge of their needs that I have, during which time they would no doubt miss significant financial opportunities.

6

In today's volatile market, these missed opportunities likely could cause my clients to suffer unnecessary financial losses.

14.    All of my clients have put their trust in me to assist them in planning for their futures, their children's futures, and other important personal matters. These clients should not be prevented -- if it is their choice to continue working with me -- from continuing to receive the valuable services that I provide to them.

15.    Credit Suisse may assert that it is entitled to "reasonable" injunctive relief against me. However, Credit Suisse's idea of "reasonable" restrictions bears no relation to true reasonableness. Credit Suisse may seek restrictions that would totally bar me from working for my clients, even if those clients desire to continue their relationship with me. If Credit Suisse is able to obtain injunctive relief against me for even a limited period of time, that relief has the potential to cause serious harm to my self-built career and my ability to support myself. I am the sole wage earner in my family, and my income is essential to support my wife and our family. I ask that the Court deny Credit Suisse's attempt to prevent me from working with my clients.

16.    The Uniform Application for Securities Industry Registration or Transfer (Form (U-4) that I signed in connection with my employment by Credit Suisse requires the arbitration of any dispute, claim or controversy that may have arisen between me and Credit Suisse. (A blank Form U-4 is _Exhibit 1_ hereto.) Accordingly, Credit Suisse is required to arbitrate its dispute with me.

7

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 17, 2007.

John L. Sullivan II