UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                                       :
CREDIT SUISSE SECURITIES (USA) LLC,    :    No. 07 Civ. 8556
                               Petitioner,             :
                                                       :
        -against-                                      :
                                                       :
JOHN L. SULLIVAN II                                    :
                                                       :
                               Respondent.             :
                                                       :
------------------------------------------------------ x


### PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTION IN AID OF ARBITRATION


CREDIT SUISSE SECURITIES (USA) LLC

Alexander C.B. Barnard (AB-3181)
One Madison Avenue, 9th Floor
New York, New York 10010
(212) 325-2000

*Attorneys for Credit Suisse
Securities (USA) LLC*

Of Counsel:
DEWEY PEGNO & KRAMARSKY LLP
220 East 42nd Street
New York, NY 10017
(212) 943-9000

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL SUMMARY ...................................................................................... 4

The Parties ....................................................................................................... 4

Sullivan Resigns and Immediately Begins Violating Limited
Restrictive Covenants He Had Repeatedly Promised to Adhere to................................ 4

Sullivan Engages in Email Solicitations of Clients and Credit Suisse Employees ................. 5

Sullivan Misappropriates Credit Suisse's Proprietary and Confidential Information.................. 6

The Confidential Information in the Files ....................................................................... 8

Credit Suisse Safeguards Its Confidential and Proprietary
Information and Sullivan Was Not Authorized to Remove or Retain It ............................... 8

The Parties' Arbitration Agreement ............................................................................ 10

ARGUMENT.............................................................................................................. 12

THE COURT SHOULD GRANT CREDIT SUISSE PRELIMINARY INJUNCTIVE
RELIEF PENDING THE ARBITRATION OF THIS DISPUTE.................................................. 12

A.    The Court Has Personal Jurisdiction Over Respondent and Venue is Proper Here .......... 12

B.    The Court is Empowered to Issue Injunctions in Aid of Arbitration ................................ 12

C.    Credit Suisse Is Likely to Succeed on the Merits of Its Claims ...................................... 14

      1.    Credit Suisse Will Prevail on Its Claim for Misappropriation of
            Trade Secrets ................................................................................................. 15

      2.    Credit Suisse Will Prevail on Its Claim for Tortious Interference with
            Contractual Relations ..................................................................................... 16

      3.    Credit Suisse Will Prevail on Its Claim for Conversion..................................... 16

      4.    Credit Suisse Will Prevail on Its Claim for Unfair Competition.......................... 17

i

*Page*

D.    Credit Suisse Will Suffer Irreparable Harm Absent Injunctive Relief..............................18

E.    Credit Suisse Is Entitled to Expedited and Limited Discovery .........................................20

CONCLUSION ....................................................................................................................................21

## TABLE OF AUTHORITIES

*Cases*                                                                    *Page(s)*

Alert Holdings, Inc. v. Interstate Protective Servs., Inc.,
    148 B.R. 194 (S.D.N.Y. 1992) ......................................................................... 19

Atlanta Shipping Corp. v. Cheswick- Flanders & Co.,
    463 F. Supp. 614 (S.D.N.Y. 1978) ................................................................ 12

Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    910 F.2d 1049 (2d Cir. 1990) ......................................................................... 13

Credit Suisse v. Carroll,
    No. 06 Civ. 6699 (S.D.N.Y. Sept. 5, 2006) .............................................. 12

Credit Suisse First Boston, LLC v. Gonzalez Padilla,
    326 F. Supp. 2d 508 (S.D.N.Y. 2004) ..................................................... 10 n.1

Credit Suisse First Boston, LLC v. Groves,
    333 F. Supp. 2d 229 (S.D.N.Y. 2004) ..................................................... 10 n.1

Credit Suisse First Boston Corp. v. Pitofsky,
    824 N.E.2d 929, 791 N.Y.S.2d 489 (N.Y. 2005) .................................. 10 n.1

In re Cross Media Mktg. Corp.,
    No. 06 Civ. 4228 (MBM), 2006 WL 2337177(S.D.N.Y. Aug. 11, 2006) ................. 15, 17

Danielson v. Local 275,
    479 F.2d 1033 (2d Cir. 1973) ......................................................................... 19

Dean Witter Reynolds, Inc. v. Byrd,
    470 U.S. 213 (1985) ........................................................................................ 13

Doubleclick, Inc. v. Henderson,
    1997 WL 731413 (N.Y. Sup. 1997) ............................................................. 20

Ecolab Inc. v. Paolo,
    753 F. Supp. 1100 (E.D.N.Y. 1991) ..................................................... 19, 20

Euro Brokers Cap. Mkts., Inc. v. Flinn,
    1993 WL 213026 (S.D.N.Y.) ......................................................................... 18

*Cases*                                                                                   *Page(s)*

Farr & Co. v. CIA. Intercontinental De Navegacion De Cuba, S.A.,
    243 F.2d 342 (2d Cir. 1957) ..................................................................12

Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,
    920 F.2d 171 (2d Cir. 1990) ..............................................................15

Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.,
    596 F.2d 70 (2d Cir. 1979) ................................................................14

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn,
    73 F. Supp. 2d 425 (S.D.N.Y. 1999) ..................................................17

New York Merchant's Protective Co., Inc. v. Rodriguez,
    837 N.Y.S.2d 341, 41 A.D.3d 565 (App. Div. 2d Dep't 2007)..........................16

North Atlantic Instruments, Inc. v. Haber,
    188 F.3d 38 (2d Cir. 1999) ................................................................20

Reliance Nat'l Ins. Co. v. Seismic Risk Ins. Services, Inc.,
    962 F. Supp. 385 (S.D.N.Y. 1997) ....................................................14

Telecom Int'l America, Ltd. v. AT&T Corp.,
    280 F.3d 175 (2d Cir. 2001) ..........................................................17-18

Ticor Title Ins. Co. v. Cohen,
    173 F.3d 63 (2d Cir. 1999) ................................................................20

Tradescape.com v. Shivaram,
    77 F. Supp. 2d 408 (S.D.N.Y. 1999) ............................................15, 18

Volt Info. Scis., Inc. v. Leland Stanford, Jr. Univ. Bd. Of Trs.,
    489 U.S. 468 (1989) ..........................................................................13

Petitioner Credit Suisse Securities (USA) LLC ("Credit Suisse") respectfully submits this memorandum of law in support of its emergency motion for injunctive relief in aid of an arbitration proceeding that Credit Suisse has commenced against Respondent John L. Sullivan II ("Sullivan") in accordance with the parties' arbitration agreement.

## PRELIMINARY STATEMENT

Credit Suisse is in dire need of an injunction to address Sullivan's unlawful misappropriation and use of Credit Suisse's confidential, proprietary and trade secret information (the "Credit Suisse Information") and his inexplicable refusal to return the Credit Suisse Information, despite Credit Suisse's repeated demands. There can be no serious dispute about the theft of information in this case. Indeed, Credit Suisse has just discovered video footage of an after-hours "document raid" in which Sullivan physically misappropriated a large quantity of Credit Suisse documents from Credit Suisse's offices two days before he had even provided notice of his intention to resign, taking evident care to cover his tracks to avoid detection. Apart from revealing the thefts themselves, the videotape shows Sullivan's unmistakably guilty conduct. He deliberately entered the office well after everyone had gone home, hid a large roller bag in the mailroom, and proceeded to "case" the office by walking throughout in an apparent effort to ensure that no one was there. Then, when the coast was clear, he hurriedly worked at his desk cleaning out files and depositing them into his bag, taking the time to place irrelevant documents, such as holiday cards, into at least one drawer whose contents he had entirely cleaned out in an obvious effort to conceal its emptiness.

A review of additional security videotape has revealed that another trusted Credit Suisse employee, Anne Dietrich, who served as a Sales Assistant to Sullivan and has resigned with him to join a competitor, also took several files just before resigning believed to contain Credit Suisse

confidential information likely at his direction. The circumstances under which these files were taken is equally troubling given that the files were taken late on the very day that Sullivan and Dietrich resigned, September 27, 2007, after the branch manager had left for the day.

Sullivan was, as of Thursday, September 27, 2007, a Director in the San Francisco, California office of Credit Suisse's Private Banking USA ("Private Banking"). Private Banking is in the business of providing investment brokerage services to high-net-worth individuals and institutions. While employed in Private Banking, Sullivan was responsible for Private Banking client accounts containing over $125 million in assets under management. On an annualized basis, these accounts presently generate approximately $1 million in revenue for Credit Suisse. Significant Credit Suisse client relationships serviced by Sullivan were developed by Credit Suisse without Sullivan's assistance, and placed into Sullivan's care as a trusted Private Banking employee. In fact, the vast majority of Credit Suisse client assets serviced by Sullivan were developed by Credit Suisse independent of Sullivan's efforts or developed at Credit Suisse with the firm's support.

In connection and to assist him with his responsibilities as a Credit Suisse employee, Sullivan had access to, and indeed used constantly, confidential and proprietary information, including client lists, client contact information, client account and holding information, confidential market research developed by Credit Suisse for Relationship Managers to use in servicing clients, and information concerning the investment strategies offered or intended to be offered to clients.

On September 27, 2007, without any prior warning, Respondent submitted his resignation to Credit Suisse, purportedly effective immediately, and indicated that he had accepted

employment with Jefferies. Jefferies is one of Credit Suisse's direct competitors, and

Respondent will be employed there in precisely the same capacity as he was at Credit Suisse.

Sullivan has revealed that the reason for his departure is that he has received a payment

from Jefferies calculated as a percentage of the revenue of all Credit Suisse clients he previously

serviced for Credit Suisse – a figure approaching $2 million. In accepting such a payment,

Sullivan has implicitly agreed to solicit as much business away from Credit Suisse as possible.

On the day he provided notice of his resignation, Sullivan expressly acknowledged that

he was obligated to comply with his restrictive covenants in his employment agreements and he

promised Credit Suisse that he would do so. His new employer, Jefferies, also led Credit Suisse

to believe he would continue to abide by these covenants, at least pending further discussions.

Since then, however, Credit Suisse learned that, in fact, Sullivan had begun working at Jeffries,

actively soliciting clients and employees Sullivan had promised not to solicit.

Sullivan's breaches of these covenants is currently the subject of arbitration proceedings

which Credit Suisse has commenced, but Credit Suisse today seeks the intervention of this Court

to address the recent discovery of Sullivan's theft of Credit Suisse Information. Respondent,

during the course of his Credit Suisse employment, agreed to abide by Credit Suisse's

Employment Dispute Resolution Program (the "EDRP") which mandates that all employment

related disputes be arbitrated before one of three specified arbitration services, subject to a

preliminary obligation to attempt to mediate the dispute. The EDRP requires that any such

arbitration (including any preliminary mediation) be conducted in the New York metropolitan

area. In accordance with EDRP requirements, Credit Suisse has commenced a mediation (which

failed to resolve the dispute) and an arbitration against Respondent. Credit Suisse to date has

served claims against Sullivan for breach of contract and breach of fiduciary duty, and will today

amend these claims to include claims against Sullivan related to his theft of Credit Suisse Information among other things.

To preserve the efficacy of any eventual arbitration, Credit Suisse requests that this Court preliminarily enjoin Sullivan, prohibiting him from using and requiring him to return any Credit Suisse Information that he misappropriated. Credit Suisse also requests that the Court order limited discovery into the precise scope of documents removed by Respondent. Absent the issuance of such relief, Respondent will be free to continue use Credit Suisse Information, irreparably damaging Credit Suisse's business and client relationships, and causing irreparable harm to Credit Suisse and its goodwill in the marketplace. If that were to happen, any arbitration award ultimately issued in Credit Suisse's favor will be a pyrrhic victory, because the damage will be complete and permanent.

## **FACTUAL SUMMARY**

### The Parties

Credit Suisse is, and at all relevant times has been, one of the world's leading financial institutions. Credit Suisse is engaged in the business of selling investment products and providing financial services to its clients. Sullivan is employed as a Director in the San Francisco, California office of Credit Suisse's Private Banking business. Respondent Sullivan is registered with the NASD (now known as FINRA) as a broker employed by Credit Suisse, and, on information and belief, has been employed with Credit Suisse as of February 1999.

### Sullivan Resigns and Immediately Begins Violating Limited Restrictive Covenants He Had Repeatedly Promised to Adhere to

On September 27, 2007, Sullivan abruptly purported to resign effective immediately and accept employment with Jefferies, one of Credit Suisse's competitors, in blatant violation of several contracts that, among other things, require him to: (a) provide sixty (60) days' notice of

4

his intent to resign; (b) refrain from engaging in competitive activity for thirty (30) days following the effective termination of his employment; (c) refrain from soliciting any of Credit Suisse's clients or employees for sixty (60) days following the effective termination of his employment; and (d) refrain from misusing Credit Suisse's confidential information. That same day, a valued Credit Suisse employee, Anne Dietrich, who served as a Sales Assistant to Sullivan at Credit Suisse, resigned with him to go to Jefferies, also effective immediately.

After his resignation, in a conversation with the branch manager of the San Francisco office, Sullivan represented to Credit Suisse that he understood he was bound by his restrictive covenants and he promised to adhere to them. In subsequent conversations, counsel for his putative new employer, Jefferies, further led Credit Suisse to believe that Sullivan would comply with the covenants, pending further discussions. Contrary to these representations, however, Jeffries' counsel has more recently informed Credit Suisse that Sullivan has commenced work and is actively soliciting Credit Suisse clients.

### Sullivan Engages in Email Solicitations of Clients and Credit Suisse Employees

After finding out that Sullivan did not intend to abide by the applicable covenants, Credit Suisse conducted an investigation into Sullivan's departure. During the course of that investigation, Credit Suisse located several emails and videotapes indicating that Sullivan's misconduct was far more serious than it initially believed. The emails demonstrate that Sullivan actively solicited Credit Suisse clients and at least one employee even before his departure. Specifically, Credit Suisse has discovered that on September 27, 2007, he sent emails to clients and at least one employee attaching an article from several days earlier praising Jefferies' business, which was apparently sent for the purposes of prohibited solicitation. Demonstrating the effectiveness of his solicitations, several clients have decided to move their business away

from Credit Suisse to Jefferies following Sullivan's departure and, and as discussed above, his

sales assistant, Anne Dietrich, determined to leave the firm to accompany him to Jeffries as well.

**Sullivan Misappropriates Credit Suisse's Proprietary and Confidential Information**

In connection with its still ongoing investigation, Credit Suisse reviewed electronic

security records, and discovered that Sullivan had entered the firm's offices on September 25,

2007, several times, well after the close of business when the office is normally empty.

Specifically, these records show repeated entries by Sullivan into Credit Suisse's offices between

the hours of 7 p.m. and as late as 10 p.m. on that evening. Given that Credit Suisse's offices are

generally empty after 5:30 p.m. (especially since the San Francisco office keeps largely New

York office hours), and Sullivan has not been known to be a late worker, these office entries

alone, given their proximity to Sullivan's departure, were cause for concern. This concern,

unfortunately, proved well founded.

Indeed, Credit Suisse has now reviewed office security videotape which confirms that

Sullivan entered Credit Suisse's offices on September 25, 2007 – two days before resigning – at

approximately 7:30 p.m. for the apparent purpose of misappropriating files from Credit Suisse.

The security videotape is routinely maintained as part of normal business operations as is

commonly known to all employees in Credit Suisse's offices at 650 California Street. The

cameras are contained in standard black hemispheres in various locations around the office.

Sullivan's actions, as captured on video camera, speak volumes. First, he enters the

office using the back hallway, carrying a large wheeled bag. He then quickly enters the copy

room, where he stows the large bag while he walks around the office in an apparent effort to

ensure that no one is working late who might observe his actions. He then goes back to the copy

room, collects the bag and goes straight to his desk, where he works for approximately 10 minutes emptying the files from his desk and credenza into the bag.

Notably, as the videotape reveals, Sullivan does not take his personal property with him. Instead, he leaves these materials, including a coffee cup, many personal greeting cards and other items on his desk after his departure. Indeed, he appears deliberately to leave his personal items to cover up for the Credit Suisse documents he takes. For example, the videotape reveals that among the other volumes of files Sullivan misappropriates, he cleans out numerous documents from his large top left drawer and places them into his roller bag. Then, upon inspecting the empty drawer, Sullivan can be seen placing a large box of greeting cards into that top left drawer, presumably so that its emptiness will not arouse suspicion. His actions in moving other files around on his desk appear likewise intended to obscure the fact that volumes of materials have been taken.

Sullivan's consciousness of guilt is further revealed in that, just before leaving the office with his cache of misappropriated documents, the videotape shows him attempting to sign into Credit Suisse's internal computer network. On the tape, he apparently becomes impatient and does not wait for the log-on to be completed, presumably because he is eager to leave the office without being detected.

Security videotape maintained by Credit Suisse's building's security, which monitors entries and departures from the firm's building, shows Sullivan leaving the building with his roller bag full of Credit Suisse files, minutes after departing Credit Suisse's offices.

The videotape also reveals that, on that day she left, Dietrich stayed in the office until 5 p.m., which was extremely rare as, on information and belief, she usually left the office by 3 p.m. Earlier that day, Dietrich was observed making several trips, with what appear to be Credit

Suisse client account files in hand between her desk and the copy room. Dietrich then, before resigning, placed at least two stacks of documents into her bags. Having done that, at approximately 5 p.m., she tendered her resignation and, on information and belief, left the office with her bags.

### The Confidential Information in the Files

Sullivan, like all of the Relationship Managers in the Credit Suisse office, was trusted to maintain working client files at his desk to do his job. Among such files, would be client lists, client contact information, client account and holding information, confidential market research developed by Credit Suisse for Relationship Managers to use in servicing clients, and information concerning the investment strategies offered or intended to be offered to clients. All of this information is compiled with great time, effort, and expense, and constitutes the life blood of Credit Suisse's business. The information is particularly sensitive and confidential, and should not be shared with any competitor, because it would provide the competitor with an unfair advantage in remaining one step ahead of Credit Suisse at each turn. Specifically, a competitor could use this information to determine Credit Suisse's marketing strategy, capitalize upon Credit Suisse's historic knowledge of its clients, destroy the goodwill it has built, and call on clients to solicit them away from Credit Suisse. After Sullivan's departure, a review the contents of his desk and credenza, and Dietrich's, revealed that, with the exception of a handful of documents, essentially no documents in these sensitive categories were left behind.

### Credit Suisse Safeguards Its Confidential and Proprietary
### Information and Sullivan Was Not Authorized to Remove or Retain It

Credit Suisse maintains company policies advising employees of their obligations to safeguard the company's assets and confidential and proprietary information, both during employment and following departure from Credit Suisse. To further maintain the confidentiality

of such information, Credit Suisse protects its physical offices by electronic security systems as well as conventional locks. It safeguards its electronic data and information by means of electronic security measures. Access to account information and other financial information about a specific customer is limited to the registered representatives responsible for managing that customer's investment accounts. Access to electronic data and information is by individual password only. No employees of Credit Suisse are authorized to keep or maintain personal records concerning customers or to take any other customer information with them when they resign from employment.

Sullivan, specifically, is not authorized to take confidential information or materials from Credit Suisse. The Credit Suisse U.S. Employees Handbook (the "Handbook"), that Sullivan promised to abide by, specifically provides that:

> all information that is confidential or proprietary to Credit Suisse must be used solely in connection with an employee's official capacity at Credit Suisse. Such information must never, under any circumstances, be used for personal gain or for the gain of any third party, including members of the employee's family or household. After they leave the Firm, employees are prohibited from using any of the Firm's confidential and proprietary information for any purpose and from disclosing such information to any person. Information may be confidential or proprietary to Credit Suisse whether it is contained in written materials such as memoranda or other documents, is generated or stored in electronic form or magnetic form, or is in unrecorded form.

During his employment with Credit Suisse, Sullivan annually agreed to be bound by and follow all of Credit Suisse's employment-related policies, including those set forth in the Handbook. Sullivan most recently indicated his agreement to be bound by Credit Suisse's policies on November 28, 2006, when he electronically signed a certification to that effect.

**The Parties' Arbitration Agreement**

Since 1998, Credit Suisse has had an Employment Dispute Resolution Program (or, "EDRP") that is applicable to all of its United States-based employees. By its express terms, the EDRP is the exclusive means for resolving any and all "Employment-Related Claims" that arise between an employee and Credit Suisse. "Employment-Related Claims" are broadly defined in the EDRP to include "[a]ll present and future claims against [Credit Suisse] by an employee, and all present and future claims against an employee by [Credit Suisse]" that "relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing, and . . . assert the violation or infringement of a legally protected right."

The EDRP provides that Employment-Related Claims shall be resolved through a three-step process. The first step requires the aggrieved party to file an internal grievance, where applicable, followed by a JAMS mediation if needed. If mediation is not successful, the employee or Credit Suisse can initiate arbitration before one of only three arbitration providers: the American Arbitration Association, the CPR Institute for Dispute Resolution, or JAMS.[1] Absent a mutual agreement to arbitrate elsewhere, arbitration under the EDRP must take place in the New York metropolitan area, and the arbitrator must apply New York law.

All United States-based Credit Suisse employees are required as a condition of employment to agree to abide by the EDRP. Respondent did so expressly on October 30, 2001, by signing an Agreement to Use Employee Dispute Resolution Program Procedures.

---

[1]      In Credit Suisse First Boston Corp. v. Pitofsky, 824 N.E.2d 929, 791 N.Y.S.2d 489 (2005), the New York Court of Appeals held that two Credit Suisse registered representatives were not bound by the provision of the EDRP limiting arbitration to these forums but could, instead, proceed before the New York Stock Exchange. Two Courts in this District have held otherwise. See Credit Suisse First Boston, LLC v. Gonzalez Padilla, 326 F. Supp. 2d 508, 513 (S.D.N.Y. 2004); Credit Suisse First Boston, LLC v. Groves, 333 F. Supp. 2d 229, 232 (S.D.N.Y. 2004). The split of authority does not matter, however, because regardless of which arbitration provider is used, Respondent is (i) bound by the EDRP and by him Form U-4 to arbitrate this dispute, and (ii) pursuant to the EDRP, arbitration must take place in New York under New York law.

Additionally, Respondent was required to, and did, periodically electronically sign a certification in which he agreed to follow all of Credit Suisse's employment-related policies and to abide by any applicable employment dispute resolution program.

On or about October 3, 2007, in the wake of Respondent's blatant improper resignation and affiliation with Jefferies, his violations of his restrictive covenants, and his stated intention to continue such violations, Credit Suisse served Respondent with demands for mediation and arbitration pursuant to the EDRP. Mediation has now failed – largely because Respondent refused to participate – and Credit Suisse has thus initiated arbitration against Respondent pursuant to the EDRP. The claims Credit Suisse is asserting in that arbitration, including claims for breach of contract, breach of fiduciary duty, tortious interference with contractual relations, misappropriation of trade secrets, unfair competition and conversion, constitute Employment-Related Claims under the EDRP, as they all "relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing . . . ."

Though Credit Suisse is committed to moving swiftly, based on past experience, it will take a period of likely weeks before the arbitration is held. In the meantime, if Respondent is not enjoined from retaining and using Credit Suisse's confidential and proprietary information for his benefit and the benefit of his new employer, any eventual arbitration relief that Credit Suisse obtains will be rendered moot, because the irreparable harm to Credit Suisse's business will have been completed.

## **ARGUMENT**

### **THE COURT SHOULD GRANT CREDIT SUISSE PRELIMINARY INJUNCTIVE RELIEF PENDING THE ARBITRATION OF THIS DISPUTE**

**A.    The Court Has Personal Jurisdiction Over Respondent and Venue is Proper Here**

Credit Suisse anticipates that Respondent may attempt to argue that because he is a citizen of California and works in California, the Court does not have personal jurisdiction over him, and/or venue is improper here.  Any such argument should plainly be rejected because Respondent agreed to arbitrate disputes with Credit Suisse pursuant to the EDRP in New York under New York law.  Under well established precedent, where parties agree to arbitrate in New York, as is the case here, they waive any objection based on personal jurisdiction or venue.  See Atlanta Shipping Corp. v. Cheswick-Flanders & Co., 463 F. Supp. 614, 618, 619, n.5 (S.D.N.Y. 1978) (where parties consent to arbitrate in New York, they consent in advance to personal jurisdiction and venue in New York.); Farr & Co. v. CIA. Intercontinental De Navegacion De Cuba, S.A., 243 F.2d 342, 346 (2d Cir. 1957) (where parties consent to New York arbitration, they consent to personal jurisdiction in New York, and are "presumed to have contracted with notice of [a] venue provision" directing that arbitration take place in New York).  Moreover, in several matters virtually identical to this case, this Court has repeatedly held that by virtue of having agreed to participate in EDRP, a litigant residing and working outside of New York was subject to jurisdiction in this Court for purposes of an order in aid of arbitration.  See, e.g., Transcript and Order of Honorable Barbara S. Jones, at 20, in Credit Suisse v. Carroll, No. 06 Civ. 6699, annexed hereto as Exhibit A.

**B.    The Court is Empowered to Issue Injunctions in Aid of Arbitration**

The Federal Arbitration Act allows and, indeed, *"requires* courts to enforce privately negotiated agreements to arbitrate . . . in accordance with their terms."  Volt Info. Scis., Inc. v.

Bd. Of Trs., 489 U.S. 468, 478 (1989) (emphasis added); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed" (emphasis in original)). The Second Circuit has long recognized that an adjunct of the power to compel arbitration is a power to issue preliminary injunctive relief to maintain the viability of arbitration. "Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1053 (2d Cir. 1990). Courts, therefore, have the ability to "preserve the meaningfulness of the arbitration through a preliminary injunction." Id. "The issuance of an injunction to preserve the status quo pending arbitration fulfills the court's obligation under the FAA to enforce a valid agreement to arbitrate." Id. at 1054.

Indeed, the court in Blumenthal specifically upheld the lower court's authority to enter a preliminary injunction in circumstances directly on point. In Blumenthal, former Merrill Lynch brokers left the firm, taking with them confidential Merrill Lynch "customer lists and other records used to service clients." See id. at 1050-51. After the brokers commenced an arbitration, Merrill Lynch sought "a preliminary injunction prohibiting [the brokers] from soliciting or accepting orders from their pre-existing [Merrill Lynch] clients." Id. at 1051. In response, the district court "preliminarily enjoined [the brokers] from using Merrill Lynch customer records or soliciting or accepting business from any Merrill Lynch client" pending the resolution of the arbitration. Id. The Second Circuit firmly rejected the brokers' argument that the district court lacked authority to issue the preliminary injunction, noting that prior Second Circuit precedent "gave explicit and broad recognition to a district court's power to grant preliminary injunctive

relief pending arbitration." Id. at 1052. Accordingly, it is beyond question that the Court has the authority to grant the preliminary injunctive relief sought by Credit Suisse here.

The standard for issuance of a preliminary injunction in aid of arbitration is the same as for issuance of a preliminary injunction generally. See Reliance Nat'l Ins. Co. v. Seismic Risk Ins. Services, Inc., 962 F. Supp. 385, 391 (S.D.N.Y. 1997). The moving party must demonstrate "'(a) irreparable harm, and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Id. (quoting Jackson Dairy Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).

## C.    Credit Suisse Is Likely to Succeed on the Merits of Its Claims

As set forth above, Credit Suisse will assert claims in arbitration under New York law[2] against Respondents for unfair competition, misappropriation of trade secrets, tortious interference with contractual relations and conversion, among others. Given Respondents' egregious conduct, Credit Suisse is likely to prevail on these claims. At the very least, this conduct gives rise to sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting the relief. Accordingly, the latter prong of the Hood test for preliminary injunctions is satisfied here.

---

[2]       As mentioned above, the EDRP requires that its mediation and subsequent arbitration proceedings take place in New York, under New York law. However, even if California law applied, California law is clear that an employer is entitled to injunctive relief to prevent confidential or proprietary information from being misappropriated by a former employee. See, e.g., All Covered, Inc. v. Moore, No. D046485, 2005 WL 2764256, at *8-9 (Cal. Ct. App. Oct. 25, 2005) (upholding the granting of a temporary restraining order and a preliminary injunction where former employees had taken confidential information about the employer's clients and used it to start their own, competing business and stating that "[t]he basic principle to be applied here is that competitors may conduct business and pursue their livelihoods as long as they do not use unlawful means to engage in acts of unfair competition, such as the misuse of confidential information or trade secrets"); see also Postdata Co. Ltd. v. Kim, No. C-07-02504, 2007 WL 1848661, at *7, *9 (N.D. Cal. June 27, 2007) (granting TRO on the basis of theft of trade secrets by former employees).

1.    **Credit Suisse Will Prevail On Its Claim for Misappropriation of Trade Secrets**

In order to prevail on a claim for misappropriation of trade secrets, a plaintiff must demonstrate "(1) that it possessed a trade secret, and (2) that defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990) (citations and internal quotation marks omitted). The information taken from Credit Suisse by Sullivan and Dietrich (at Sullivan's apparent direction) qualifies as a trade secret. See, e.g., N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999) (customer list "developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable"); In re Cross Media Mktg. Corp., No. 06 Civ. 4228 (MBM), 2006 WL 2337177, at * 4-5 (Aug. 11, 2006) (finding that compilation of customer information was trade secret).

It appears that Respondent is already using that information. He has started employment at one of Credit Suisse's competitors and has already begun to solicit Credit Suisse clients. Moreover, the fact that he went to such great lengths wrongfully to obtain Credit Suisse's confidential information strongly suggests that he had plans for its use. Courts will grant injunctive relief under these circumstances. Tradescape.com v. Shivaram, 77 F. Supp. 2d 408, 419 (S.D.N.Y. 1999) (granting preliminary injunction based on "direct and circumstantial evidence of copying [that] is strongly suggestive of misappropriation").

At the very least, Respondent's conduct gives rise to sufficiently serious questions going to the merits of this claim to make them a fair ground for litigation, and balance of hardships tips strongly in favor of Credit Suisse. While Credit Suisse stands to lose volumes of confidential

information, with untold ramifications for its business and goodwill, Sullivan must only forgo the retention and use of this information, information which should not be in his possession in the first place.

### 2.    Credit Suisse Will Prevail on Its Claim for Tortious Interference with Contractual Relations

A plaintiff must demonstrate "existence of a valid cause of action with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach and damages" in order to make out a claim for tortious interference with contractual relations. New York Merchant's Protective Co., Inc. v. Rodriguez, 837 N.Y.S.2d 341, 342, 41 A.D.3d 565, 566 (2d Dep't 2007). Credit Suisse can also establish its likelihood of success on this claim. Here, Credit Suisse had valid contracts with its clients, contracts of which Respondents were certainly aware. Despite this awareness, Respondent removed confidential information, including information concerning clients' history and investment preferences, apparently intending to use that information to solicit those clients themselves—in other words, to encourage the clients to end their relationship with Credit Suisse and bring their business to Jeffries.

### 3.    Credit Suisse Will Prevail on Its Claim for Conversion

In order to prevail on a claim for conversion, Credit Suisse must demonstrate that "1) the plaintiff has an immediate right to possession of the property converted; 2) the defendant's possession of the property was unauthorized; 3) the defendant acted to exclude the rights of the lawful owner of the property; 4) the property is specifically identifiable; and 5) the defendant is obligated to return the property." In re Cross Media Mktg. Corp., No. 06 Civ. 4228 (MBM), 2006 WL 2337177, at * 6 (S.D.N.Y. Aug. 11, 2006). Sullivan's conduct easily establishes each of these elements. Sullivan left Credit Suisse's offices with confidential information *belonging*

to Credit Suisse. Sullivan did not even take his personal property with him when he left—he took Credit Suisse's property, such as: client lists, client contact information, client account and holding information, confidential market research, and information concerning the investment strategies offered or intended to be offered to clients. Sullivan's removal of these documents prevented Credit Suisse, the lawful owner, from having access to and possession of the documents. Sullivan is obligated to return the files, which belong to Credit Suisse and which Sullivan was never authorized to remove.

Courts have routinely granted requests for injunctive relief based on conversion of proprietary customer information. See id. at *6 (upholding judgment on conversion claim based on unauthorized sale of customer information). See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn, 73 F. Supp. 2d 425, 429 (S.D.N.Y. 1999) (granting preliminary injunction and finding that plaintiffs were likely to succeed on the merits of its claim, including claim for conversion, where "the facts…suggest strongly that Defendants removed confidential documents from Merrill Lynch and solicited customers that they serviced while employed at Merrill Lynch").

### 4.    Credit Suisse Will Prevail on Its Claim for Unfair Competition

Under New York law, the "essence of an unfair competition claim is . . . that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either though fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom Int'l America, Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001). Such a showing is easily made here. Acting while Credit Suisse's employee with fiduciary obligations, Respondent wrongfully took (under cover of night) Credit Suisse's confidential information. As the Telecom court put it, this is the "essence" of an unfair

competition claims. See also Merrill Lynch, 73 F. Supp. 2d at 429 (granting preliminary injunction and finding that plaintiffs were likely to succeed on the merits of claim for unfair competition, among others, where "the facts…suggest strongly that Defendants removed confidential documents from Merrill Lynch and solicited customers that they serviced while employed by Merrill Lynch").

**D.    Credit Suisse Will Suffer Irreparable Harm Absent Injunctive Relief**

The one remaining prong of the Hood test for injunctive relief—irreparable harm—is likewise satisfied here. Credit Suisse seeks preliminary injunctive relief in order to prevent Respondent from permanently damaging Credit Suisse's business interests pending the resolution of the arbitration that Credit Suisse has commenced against Respondent. In the absence of the requested injunctive relief, the very harm that Credit Suisse seeks to address via the arbitration will occur before a decision can be rendered. Thus, the parties' arbitration will be effectively rendered moot unless the status quo is preserved. The loss of Credit Suisse's right to meaningfully resolve disputes through arbitration constitutes irreparable harm. Respondent's wrongful use of Credit Suisse's confidential and proprietary information itself constitutes additional irreparable harm. Indeed, such conduct is presumed to give rise to irreparable injury. See, e.g., Euro Brokers Cap. Mkts., Inc. v. Flinn, 1993 WL 213026, at *1 (S.D.N.Y.) ("The loss of an employer's confidential customer information cannot be compensated by money damages."); Tradescape.com v. Shivaram, 77 F. Supp. 2d 408, 410 (S.D.N.Y. 1999) (misappropriation of trade secrets presumed to give rise to irreparable injury). Respondent's conduct has caused, and will continue to cause, irreparable harm and damage to Credit Suisse's business and goodwill for which there is no adequate remedy at law. Respondent's use of Credit's Suisse's own competitive information against it threaten to

seriously compromise years of substantial investment by Credit Suisse in its goodwill and relationships cultivated with its customers and potential customers. Credit Suisse's relations with its clients are critical to its continued success. Credit Suisse now faces the potential destruction of both Credit Suisse's clients' goodwill—which Credit Suisse has spent millions of dollars to develop—and the vast and critical potential referral of additional business.

Credit Suisse's loss of its confidential information along with its goodwill and customer relationships cannot be compensated by money damages. Injunctive relief is appropriate here, because there is simply no way to know the amount of future revenue that Credit Suisse will lose if Respondent is permitted to continue to flout the law. Courts in this Circuit have routinely recognized that such losses are not compensable in money alone, and as such, constitute irreparable harm:

> Loss of goodwill constitutes irreparable harm which cannot be compensated by money damages. The use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage constitute irreparable harm.

Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (citations omitted); see also Danielson v. Local 275, 479 F.2d 1033, 1037 (2d Cir. 1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.").

Numerous courts have recognized that injunctive relief is appropriate to prevent such irreparable losses. See, e.g., Alert Holdings, Inc. v. Interstate Protective Servs., Inc., 148 B.R. 194, 201 (S.D.N.Y. 1992) (loss of customers, associated good will and disclosure of trade secrets demonstrated irreparable harm entitling petitioner to preliminary injunctive relief); Ecolab Inc., 753 F. Supp. at 1114-15 (enjoining former employees from competing with Ecolab where there was evidence of misappropriation of confidential information); North Atlantic

Instruments, Inc. v. Haber, 188 F.3d 38 (2d Cir. 1999) (affirming grant of preliminary injunction to restrain former employee from continuing to use trade secret client information that he had taken from his employer); Doubleclick, Inc. v. Henderson, 1997 WL 731413, at *4 (N.Y. Sup. 1997) (granting injunction preventing competition where former employee misused trade secrets while still employed). Credit Suisse urgently needs an injunction in this case in order to prevent irreparable harm.

**E.    Credit Suisse Is Entitled to Expedited and Limited Discovery**

To enable it to further support its application for a preliminary injunction, to further ensure that its right to arbitrate its claim is not undermined and that the misappropriation of its confidential information is not irremediable, Credit Suisse seeks expedited and limited discovery, relating solely to the issues raised in this application for temporary restraining order. Specifically, Credit Suisse seeks discovery on precisely what documents Respondent has taken and what he has done with the information in those documents. Courts often grant requests for expedited discovery under such circumstances. See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 67 (2d Cir. 1999) ("The parties conducted expedited discovery and briefed the relevant issues" in period between TRO and preliminary injunction hearing).

## <u>CONCLUSION</u>

For the foregoing reasons, Credit Suisse's petition for an injunction in aid of arbitration should be granted.

Dated: New York, New York
       October 16, 2007

<div style="margin-left:40%">

CREDIT SUISSE SECURITIES
(USA) LLC

*Alexander Barnard*

Alexander C.B. Barnard (AB-3181)
One Madison Avenue, 9th Floor
New York, New York 10010
(212) 325-2000


Of counsel:
DEWEY PEGNO & KRAMARSKY LLP
Stephen M. Kramarsky (SK-6666)
220 East 42nd Street
New York, NY 10017
(212) 943-9000

*Attorneys for Credit Suisse*
*Securities (USA) LLC*

</div>

EXHIBIT A

6955CREC.txt

1

6955CREC                 conference
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    CREDIT SUISSE FIRST BOSTON,
3    L.L.C.,
4
4                    Plaintiff,
5
5            v.                              06 Civ. 6699 (BSJ)
6
6    DARCY C. CARROLL,
7
7                    Defendant.
8
8    ------------------------------x
9
9                                      September 5, 2006
10                                     1:06 p.m.
10   Before:
11
11                    HON. BARBARA S. JONES,
12
12                                     District Judge
13
13                    APPEARANCES
14
14   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
15        Attorneys for Plaintiff
15   BY:  ALEXANDER BARNARD
16        -and-
16        LORI PENNAY
17        Credit Suisse in-house counsel
17
18   SAUL EWING, L.L.P.
18        Attorneys for Defendant
19   BY:  CHARLES CURTLETT
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

6955CREC                 conference
1        (Case called)
2            THE COURT:  Well, I have read the papers.  Let me hear
3    from you, Mr. Curtlett.
4            MR. CURTLETT:  If I may begin, Judge, with the fact
5    that I believe that Rule 65 requires notice before a
6    temporary -- an application for temporary restraining order can
7    be made.
8            As you probably can surmise from the quality of even
9    the formatting of my papers, we have had no notice and --
10   virtually, no notice.
11           THE COURT:  I don't have any papers from you, do I?
12           MR. CURTLETT:  Yes.  Our motion to dismiss this
13   complaint for lack of personal jurisdiction and transfer venue.
14           THE COURT:  My secretary put something on my desk, is
                    Page 1

6955CREC.txt

15  that what it was?
16          MR. CURTLETT:  Yes.
17          THE COURT:  Here it is.  Sorry.
18          MR. CURTLETT:  Well, you will notice --
19          THE COURT:  Well, people get temporary restraining
20  orders ex parte without notice so there is no absolute bar, to
21  my knowledge.  But, in any event, go ahead.
22          MR. CURTLETT:  Thank you.
23          THE COURT:  And now you have some notice.
24          MR. CURTLETT:  Well, I'm here.  But the reason I'm
25  here, your Honor, is purely coincidental, in fact.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              3

6955CREC                     conference
1           About a year ago a man named Bill Rienhoff, who
2   previously worked for Credit Suisse First Boston, left the
3   office of that to join Brown Advisory in Baltimore.
4           Credit Suisse -- at the time Ms. Pennay was involved
5   in that action and Mr. Barnard represented Credit Suisse at
6   that time; in that case they filed for temporary restraining
7   order in this court.
8           Yesterday afternoon a partner of my law firm which I
9   work with even had a conversation with Mr. Barnard, asked him
10  if, when and where he may be intending to file this.  And I
11  believe -- and he can correct me if I'm wrong, certainly --
12  Mr. Barnard's answer was his clients hadn't yet decided.
13          It seems to me though from the voluminous nature of
14  the nature of the paper that they were preparing to file in
15  this court.
16          Notice would have been appreciated.
17          I took a train up from Baltimore, came to this office,
18  again with no notice that this application would be filed, and
19  learned from the clerk downstairs that this is where the matter
20  was pending and raced upstairs.  Your secretary was nice enough
21  to allow me to print from my Google e-mail account the papers
22  which had so hastily been prepared.
23          THE COURT:  There is one really easy way to deal with
24  this is.  You can come back here at 2:00 when you have had an
25  opportunity to read all the papers.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              4

6955CREC                     conference
1           MR. CURTLETT:  I am prepared to make my argument, your
2   Honor.
3           THE COURT:  Okay.
4           MR. CURTLETT:  And the reason is that we bring a
5   motion to dismiss this claim on several grounds.
6           First is for lack of personal jurisdiction over Darcy
7   Carroll.  There are not -- she does not have sufficient
8   contacts with New York for this Court to exercise jurisdiction
9   over her.  She worked for Credit Suisse First Boston which is
10  headquartered in New York but there the contacts end.
11          She worked in the Baltimore office of Credit Suisse
12  First Boston.  The employment letter that she signed was from
13  Credit Suisse, came from Bill Rienhoff from the Baltimore
14  office, and when she terminated that -- and that was in July of
15  2001.  And when she terminated that employment agreement on
16  September 1st of 2006 to join Brown Advisory, that occurred in
17  Baltimore and she is joining that office in Baltimore.
18          Everything about this case but for this motion takes,
19  concerns Baltimore, Maryland.  For that reason, your Honor, we
                         Page 2

6955CREC.txt
20  believe that this Court does not have jurisdiction.
21       If your Honor, however, finds that this Court can
22  exercise personal jurisdiction over Mr. Curtlett, we would move
23  to dismiss under the first filed rule.
24       When we did not obtain satisfactory answer from
25  Mr. Barnard about what may be happening, what CSFB's plans were
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    5

6955CREC                        conference
1   in this case, on the basis of the letter that Ms. Carroll
2   received from Ms. Pennay on Friday which made out plainly that
3   CSFB's position was that she could not accept the employment,
4   she was still deemed to be an employee of Credit Suisse First
5   Boston and she could not service her clients, we prepared an
6   action for declaratory judgment and filed it this morning at
7   9:47 a.m. in the Circuit Court of Maryland for Baltimore City.
8        We believe that's where this case belongs.
9        THE COURT:  You know, first filed actions only relate
10  to actions between Federal Courts.
11       MR. CURTLETT:  I recognize, your Honor, that the
12  traditional notions of comity and the case law that's developed
13  is between those courts, but your Honor certainly has the
14  discretion to recognize the --
15       THE COURT:  No.  The first filed rule is only between
16  Federal Courts.  Comity may well implicate a state court.
17       MR. CURTLETT:  Your Honor, to the extent that the
18  first filed rule is inapplicable here because we filed in state
19  court, I would ask your Honor under the notion of comity to
20  respect the jurisdiction of the Circuit Court in Baltimore City
21  to hear this action.
22       Third, your Honor, venue is not proper in this court,
23  we believe.  And again, the reason being that all of the
24  substantial contacts in this case, everything that occurred,
25  the offices where the people worked, where the employment
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    6

6955CREC                        conference
1   agreement was put together -- everything occurs in Baltimore,
2   Maryland.  We believe that Baltimore, Maryland, is the
3   appropriate venue for this case.
4        And finally the fourth ground, your Honor, which I
5   don't believe is elucidated in significant degree in my hastily
6   prepared papers, we have a motion to dismiss this case or
7   transfer it to the Baltimore City Circuit Court as a forum
8   nonconveniens for the same reasons that I have previously
9   stated.
10       THE COURT:  Okay.
11       MR. CURTLETT:  Thank you, Judge.
12       THE COURT:  Who is speaking for the plaintiff?
13       MR. BARNARD:  I am, your Honor.  Alex Barnard for the
14  Credit Suisse Securities, U.S.A., l.L.C.  With me is Lori
15  Pennay, in-house counsel.
16       Let me just respond to the points raised by
17  Mr. Curtlett.
18       First of all, your Honor is right to point out that
19  the first filed rule only applies in federal courts.  And I'm
20  not aware of authority, although I only received Mr. Curtlett's
21  papers as he did mine, moments ago, of authority that would say
22  that the first filed rule applies when you are talking about an
23  action that's filed within a handful of hours between actions.
24       In any case, this notion that Ms. Carroll is not
                          Page 3

6955CREC.txt
25    subject to jurisdiction here or that venue is not appropriate
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

6955CREC                conference
1    here has been answered clearly by the Second Circuit and its
2    holding is binding here. And the case I'm referring to, your
3    Honor, it is on page 9 of our brief, and the cases, there are
4    actually two of them, one is the Southern District of New York
5    1978 decision entitled Atlanta Shipping Corp v.
6    Cheswick-Flanders. That is state case in which this very Court
7    specifically recognized that by consenting to arbitrate in New
8    York, you consented advanced to personal jurisdiction and to
9    venue in New York. And the Second Circuit decision I'm
10   referring to is Farr & Co. v. CIA Intercontinental Navegacion
11   de Cuba, a Second Circuit case which likewise is, and there is
12   a quote for it here in our brief, which says that the parties,
13   where they have consented to a New York arbitration, they are
14   presumed, and I quote, presumed to have contracted with notice
15   of a venue provision directing that arbitration take place in
16   New York.
17           THE COURT:  Okay. Well, the obvious question though
18   is did they agree to arbitrate in New York?
19           MR. BARNARD:  Did they --
20           THE COURT:  No, no. Let's assume they agreed to
21   arbitrate in New York. Does that mean that they've agreed to
22   my jurisdiction? Or are you saying an agreement to arbitrate
23   would necessarily implicate the District Court?
24           MR. BARNARD:  Well, your Honor, what these cases
25   recognize is that if you agree to arbitrate in New York, you
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

6955CREC                conference
1    are essentially committing to have your dispute and the merits
2    of that dispute decided by arbitrators.
3           THE COURT:  Right.
4           MR. BARNARD:  But for purposes of courts to compel --
5           THE COURT:  To compel or whatever.
6           MR. BARNARD:  -- we are seeking here a very limited
7    restraining order which would hold the status quo in place
8    pending a preliminary injunction hearing and pending what will
9    be a swift arbitration.
10           Now, just so that your Honor is up to speed, I don't
11   know if your Honor has already seen the agreement, but if you
12   turn to Mr. Jenkins' declaration, there is not any question
13   about whether the parties here have agreed to arbitrate in New
14   York.
15           If you go to Exhibit F of Mr. Jenkins' declaration,
16   you will see there is an agreement to use employment dispute
17   resolution procedures which he signed.
18           If you flip back to Exhibit E and you go to the last
19   page, which is page 8 of Exhibit E and Exhibit E itself is the
20   Employment Dispute Resolution Program which that agreement
21   applies to, by its terms, and the last page indicates that
22   arbitration will take place in the New York City metropolitan
23   area unless the parties agree otherwise and that the law that
24   is applied will be New York Law.
25           In addition, in her letter agreement, which is Exhibit
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

6955CREC                conference
Page 4

6955CREC.txt
```
 1    A to the Jenkins declaration, if you get to the second page
 2    there is a -- it indicates that, just for, as additional
 3    support for this Court's jurisdiction, it indicates that the
 4    letter is interpreted in accordance with the laws of the State
 5    of New York and that disputes arising under this agreement
 6    which governs her employment are going to be governed by the
 7    dispute resolution policy, which is what we just looked at, and
 8    talks about New York arbitration.
 9            So, your Honor, we submit, respectfully, that there is
10    no significant dispute about whether or not this Court has
11    jurisdiction because the Second Circuit has held that it does
12    have jurisdiction and should exercise it.
13            And then the question becomes why are we here?  And if
14    I may, your Honor, to try to boil this down, the respondent is
15    a long-time employee of Credit Suisse and agreed, in exchange
16    for substantial compensation which we have set forth in, again,
17    Mr.Jenkins' declaration --
18            THE COURT:  I did read that.
19            MR. BARNARD:  -- in exchange for signing this
20    agreement, in addition to being employed, in addition to her
21    receiving her normal salary she received significant sums worth
22    several hundred thousand dollars.  And, in exchange, she signed
23    the agreement, the agreement set limited restrictive covenants,
24    30-day notice period followed by a 30-day period of
25    non-solicitation.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                10
```
6955CREC              conference
 1            The reason these restrictions are put in place and why
 2    they're so critical in this industry is because brokers are the
 3    face of Credit Suisse.  They're the face of every firm that
 4    they work for and the brokers are entrusted with these
 5    relationships to maintain them for the benefit of the firm.
 6            So, from the customer's perspective, the person they
 7    deal with, that is the firm.  That is the face of Credit
 8    Suisse.
 9            There are sometimes disputes about whether or not, for
10    example, a broker has brought on clients and therefore ought to
11    have some protectable interest in contacting those clients.
12    This isn't that case.
13            In this situation, we have someone who served a
14    service capacity only, essentially brought on almost no clients
15    whatsoever, and was merely servicing clients that were brought
16    on through the blood, sweat and tears -- if you will pardon the
17    colloquialism -- of other people and that were developed by
18    Credit Suisse through no help of her.
19            And now what she is seeking to do is to aggressively
20    solicit those clients in violation of the limited agreement.
21    And, again, the agreement provides a mere 60-day window in
22    which Credit Suisse had an opportunity to take a new set of
23    brokers or a new broker and introduce that to the client in an
24    effort to retain the business.
25            THE COURT:  So, if I have this correctly, her
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                11
```
6955CREC              conference
 1    employment agreement basically obligates her to give 30 days'
 2    notice, and after that an additional 30 days, during which she
 3    is essentially enjoined by agreement from contacting clients.
 4            MR. BARNARD:  Yes, your Honor.
 5            And the purpose of the notice period is so that when
                            Page 5
```

6955CREC.txt
```
 6    things are left up in the air, as with many professions when
 7    you leave a particular employ, you give a period of notice so
 8    that obligations can be transferred to others.
 9             In this case, the respondent tendered her notice at
10    about 4:00 on Friday and that very same day, if your Honor has
11    had a chance to look at it in the Kelly declaration as an
12    exhibit, we have her e-mail that went out to, we believe,
13    though we don't have proof of who it went to because we can't
14    see from the document, but as of 4:43 p.m. there is an e-mail
15    that goes out to clients announcing her presence now at Brown
16    Advisory.
17             And we know that respondent was very busy over the
18    weekend because clients have been calling and complaining and
19    saying, what is going on?  Is her senior partner getting out of
20    the business?  Is Credit Suisse getting out of the business?
21    what's going on?  And asking for some kind of an explanation.
22             And what we have learned is that throughout the course
23    of the weekend respondent has been calling clients, she has
24    been sending them forms for the purpose of transferring their
25    accounts over to her new employer.  She used the weekend to do
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
                                                              12
6955CREC                    conference
```
 1    that in an effort to prevent Credit Suisse from being in a
 2    position to enforce its rights -- and that's all that Credit
 3    Suisse seeks here.  And it is a very limited amount of relief,
 4    again, that would only extend until such time as the arbitrator
 5    can render a decision.
 6             Credit Suisse stands ready to move forward with
 7    arbitration with all due speed and is absolutely willing to do
 8    that in connection with your Honor's order but, we submit,
 9    these restrictions of a mere 60 days, if you look at the T-Cor
10    case, the Maltby case, there we are talking about six months.
11             THE COURT:  No.  Frankly, I have never seen an
12    employment agreement that had such a short prohibition --
13             MR. BARNARD:  Well, your Honor --
14             THE COURT:  -- for an employee.
15             Okay.
16             MR. CURTLETT:  Your Honor?
17             THE COURT:  Yes, Mr. Curtlett.
18             MR. CURTLETT:  Ms. Carroll has not consented to
19    arbitrate in New York.
20             There is a provision within this agreement -- and not
21    this particular copy of the agreement, or if it is there I have
22    been unable to locate it in this short time but perhaps
23    Ms. Pennay is knowledgeable -- that the provisions of this
24    dispute resolution mechanism contained in the CSFB employment
25    agreement defers to any arbitration procedure that is required
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
                                                              13
6955CREC                    conference
```
 1    for any registered representative.
 2             Arbitration, under the NASD, is mandatory under the
 3    rules of the NASD, and Ms. Carroll is a registered
 4    representative.
 5             THE COURT:  Right.
 6             MR. CURTLETT:  Accordingly, if this proceeds to
 7    arbitration, it is towing gob to the an NASD arbitrations and
 8    the NASD arbitrations do not have choice of venue or choice of
 9    law clause.  It does not have a venue clause.
10             The venue of arbitration under the NASD rules is
                        Page 6
```

6955CREC.txt
11    determined by the panel of arbitrators once the arbitration has
12    been initiated.
13          So, we strongly dispute this argument that she has
14    consented to arbitrate here.
15          THE COURT:  Well, I would like to hear your answer on
16    that, although I assume that once you have put in your notice
17    of arbitration in New York that's sufficient as of the moment
18    for jurisdiction, even if the panel were later to change the
19    venue.
20          But, what's the answer?
21          MR. BARNARD:  Well, your Honor, I think what you hit
22    upon is certainly one sufficient answer.  A separate answer is
23    that it is true that the EDRP or the Dispute Resolution
24    Provision does a carve-out if you are legally required to
25    arbitrate elsewhere, but that precise issue has been litigated
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              14
6955CREC                   conference
1    in various courts and in the New York Court of Appeals which
2    held that the EDRP's provision wasn't binding.  But it has also
3    been held in two cases in this court that held that it was.
4    And this precise issue that Mr. Curtlett is raising was present
5    in those cases.  The respondent there said, look, we are
6    required to arbitrate under the New York Stock Exchange rules,
7    we shouldn't have to go forward under EDRB.  And the Court, in
8    both instances, referring to the Padilla case and Gross case
9    that is in our brief, in both instances this Court held that
10    EDRP is enforceable.
11          Your Honor, I would strongly suggest that the issue of
12    whether it is EDRP arbitration or it is NASD arbitration or
13    some other kind of arbitration, it is very clear -- and nobody
14    disputes that this is going to be arbitrated -- it is clear
15    that the parties have agreed that any arbitration that is going
16    to happen is going to happen in New York, and it is clear that
17    there is a New York arbitration right now.
18          So, there is --
19          THE COURT:  It is certainly clear that there is a New
20    York arbitration right now.  What's the agreement that it is
21    going to happen in New York?  I thought that's what
22    Mr. Curtlett was arguing about.
23          Under the EDRP it is certainly going to happen in New
24    York, right?
25          MR. BARNARD:  Yes, your Honor.  It says that any
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              15
6955CREC                   conference
1    mediation or arbitration will take place in the New York City
2    metropolitan area.
3          THE COURT:  And, would you read that to cover any NASD
4    arbitration?
5          MR. BARNARD:  I would.  Because as you read the policy
6    that way that Mr. Curtlett has set it forth, which I don't
7    necessarily take issue with, even if it is true that you are
8    required to follow the auspices of NASD or New York Stock
9    Exchange, Mr. Curtlett has forthrightly admitted those
10    arbitration procedures don't provide for a particular venue.
11          THE COURT:  Right.
12          MR. BARNARD:  The parties are free to agree.
13          THE COURT:  Right.
14          MR. BARNARD:  And, again, I don't necessarily want to
15    concede the point on NASD being required form of arbitration.
                         Page 7

6955CREC.txt

16    I don't concede that.
17         THE COURT:  Right.
18         MR. BARNARD:  And the argument there, which this
19    Court, again, has agreed with twice is, Look, those arbitration
20    procedures apply and they say that, they use this language, "at
21    the instance of."  So, an employee is entitled to arbitration
22    at its instance or the member firm, such as Credit Suisse, is
23    entitled to arbitration at its instance.
24         We have argued successfully to this Court twice that
25    that language means that it is a voluntary arbitration before
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              16
6955CREC              conference
1    NASD so that the EDRP carve-out which says you are required to
2    go somewhere else doesn't apply because you are not required
3    to.
4         But, in any case, I don't want to get too bound up.
5    The bottom line, your Honor, we believe is that there is a
6    clear agreement to be in New York and that there is arbitration
7    here which provides this Court with jurisdiction under Second
8    Circuit precedent.
9         THE COURT:  Mr. Curtlett, unless you have any other
10    arguments with respect to this issue?
11         MR. CURTLETT:  I would only be inclined to reiterate
12    those I have already made.
13         THE COURT:  I believe that I do have jurisdiction,
14    certainly because there is already an arbitration pending in
15    this district.
16         MR. CURTLETT:  Your Honor, I'm sorry to interrupt.
17         THE COURT:  Yes.
18         MR. CURTLETT:  I didn't move beyond the issue of
19    arbitration but I would like a moment to respond to one of
20    Mr. Barnard's arguments concerning the propriety of where this
21    action should be located.
22         Again, and this is to reinforce the argument I made
23    regarding comity with respect to the Circuit Court in Baltimore
24    City.
25         Ms. Carroll, these are not -- these are not Credit
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              17
6955CREC              conference
1    Suisse' terms.  The people, these customers have the right and
2    it has been recognized in numerous case law by the NASD to do
3    business with the broker of their choice.  They can exercise
4    their free will.  They can sign on with Ms. Carroll at her new
5    location.
6         THE COURT:  I couldn't agree with you more.  The
7    customers can go wherever they want.  We are focused here on
8    whether Ms. Carroll can give no notice and then begin
9    soliciting customers.  And I know you understand that,
10    Mr. Curtlett.
11         MR. CURTLETT:  Sure, your Honor.
12         THE COURT:  But, at this point Mr. Barnard has filed
13    an action for declaratory judgment to pronounce upon the
14    enforceability of the provisions of this employment agreement.
15         MR. CURTLETT:  This 30-day notice provision,
16    particularly as is being enforced and would be enforced by CSFB
17    is effectively, for all practical purposes, a non-compete
18    clause.  She cannot service her clients.  She has to sit down
19    at her couch at home during the notice period.  She is not able
20    to come into the offices of Credit Suisse First Boston.  She is
                        Page 8

6955CREC.txt

21  precluded from being able to service her clients as they would
22  interpret that agreement.
23          That provision, we would argue, is unenforceable under
24  the provisions of the NASD because it violates Rule 2110-67 and
25  how that rule has been interpreted by the NASD.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    18
♀       6955CREC               conference
 1              Again, we believe it should be decided in court in
 2  Baltimore where most of the clients are located, where
 3  Ms. Carroll is located, where Brown Advisory is located, where
 4  Mr. Rienhoff is located and Credit Suisse First Boston is
 5  located.
 6              THE COURT:  On your argument that you say in comity I
 7  should defer to Baltimore, I don't find these issues so
 8  geographically collected.  It seems to me the NASD and the
 9  arbitration process they have is sophisticated enough in
10  dealing here with issues that aren't that complicated that they
11  are certainly able to handle such an arbitration in New York
12  and the arbitrators can decide whether they want to change it.
13              So, in terms of comity, I'm not persuaded that there
14  is any real need for this to be in Baltimore.  It could
15  probably be anywhere in the United States in terms of being
16  able to decide these issues and I can't transfer a case from my
17  Court to Baltimore in any event.  So, we don't have a 1404A
18  issue here.
19              But, anyway, leaving all of that aside, do you have
20  any arguments that this isn't the agreement that she signed,
21  the one that is attached to their papers?  I mean, that's the
22  agreement, right?  You are arguing that it is, the first
23  provision is unenforceable?  The 30 day --
24              MR. CURTLETT:  The 30-day notice provision; that's
25  correct, your Honor.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    19
♀       6955CREC               conference
 1              THE COURT:  Okay.  I will hear from the plaintiff on
 2  that.
 3              MR. BARNARD:  Certainly, your Honor.
 4              First of all, what I think what your Honor recognized
 5  initially is the right way to look at this, which is that the
 6  restriction that we are seeking to enforce here does not bind
 7  any client from working with whatever broker they want to.
 8              If a client wants to move his or her account to a
 9  various broker or over to Ms. Carroll's new employer, they're
10  free to do that.  We wouldn't presume to be able to hinder that
11  in any way and we are not seeking to.
12              I do have some concerns about whether the NASD's
13  determination is something that's binding on this Court or not
14  when what we are talking about is a substantive provision that
15  is, from our perspective, eminently reasonable under settled
16  New York case law which says that you can have a restriction
17  like this.  As long as you bargain for it, as long as there is
18  consideration, if the parties enter into an agreement, you will
19  enforce that agreement.
20              THE COURT:  Well, this goes to your remark that you
21  don't concede that this is an NASD arbitration, am I right?
22              MR. BARNARD:  That's part of it, your Honor.
23              THE COURT:  Okay.
24              MR. BARNARD:  But, I also think that even if this
25  were, if we concede that we are not in NASD arbitration, what
                        Page 9

6955CREC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

6955CREC                    conference
1   is the effect of the NASD having said you can't bind up clients
2   from being able to move their assets?  What is the effect of
3   that on this Court?  And I'm not aware of authority that would
4   suggest that that is binding on this Court on the face of what
5   is clearly binding precedent on the enforceability of contracts
6   and holding people to the deals that they strike.
7           THE COURT:  Well, in any event, you are not asking me
8   to do anything with respect to these clients.
9           MR. BARNARD:  No, your Honor.  We are not.
10          THE COURT:  So, I don't find that to be an issue.
11  Look.  I have read the employment agreement.  It seems very
12  clear to me what the rules were.  It is also quite clear,
13  looking at the compensation agreement, that there is plenty of
14  consideration here for this and I believe I have jurisdiction
15  based on the filing of the arbitration.  So, I'm going to give
16  you your TRO.
17          That doesn't mean that you can't file another motion
18  with respect to jurisdiction, which of course can be filed at
19  any time.  But, that is my ruling as of today.
20          Shall we move to hearing on preliminary injunction?
21  What do you want, Mr. Curtlett?
22          MR. CURTLETT:  I would like the opportunity to submit
23  papers to your Honor on that point.
24          THE COURT:  Okay.
25          MR. CURTLETT:  I can give you this set but I am
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

21

6955CREC                    conference
1   otherwise unorganized.
2           THE COURT:  I understand.
3           Let me look at some provisions of the TRO here because
4   I think one is a little broad, and you may want to address
5   yourself to this, Mr. Curtlett.
6           A.  Respondent is enjoined from employment with any
7   entity other than Credit Suisse until her resignation becomes
8   effective on October 12005.
9           Do you mean any competitive entity or any entity?  If
10  she wanted to teach school or work at a grocery store, is that
11  covered by the agreement?
12          MR. BARNARD:  Your Honor, it technically is, but we
13  would concede that it can be any competitive entity, other than
14  Credit Suisse.
15          THE COURT:  All right.  I think I would feel more
16  comfortable putting that in.
17          I am content with B.  I think that's standard
18  restraint in non-compete agreements.
19          MR. CURTLETT:  I don't have this document in front of
20  me.
21          THE COURT:  C looks okay, unless you have objection to
22  that, Mr. Curtlett.
23          I object to all of this, but.
24          MR. CURTLETT:  For the record, your Honor, certainly I
25  do.
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

22

6955CREC                    conference
1           THE COURT:  But for the language.
                        Page 10

6955CREC.txt

```
 2        MR. CURTLETT:  If I can have --
 3        THE COURT:  Yes.
 4        MR. CURTLETT:  Well, I'm not sure what evidence there
 5   is before your Honor with respect to evidence of what she took
 6   from Credit Suisse at this point.
 7        MR. BARNARD:  If I may respond?
 8        THE COURT:  Yes.
 9        MR. BARNARD:  The issue is in contacting clients with
10   Credit Suisse, with clients, she used, we believe, the
11   information and information about their clients and information
12   that is relevant to knowing what kind of holdings they may
13   have, what the risk preferences are, tolerances, what they may
14   be looking for in terms of investment strategies and history,
15   and all of that data gives the competitor advantage in taking
16   the client.
17        We are not suggesting that we know she took a list of
18   clients with her.  We don't know that.  But, we strongly
19   suspect it and we know that communications were made and ICAT
20   forms were sent to key contacts.
21        I may point out that client information, there is no
22   question that it is trade secret protected, in particular in
23   this industry with the expenses Credit Suisse has to spend in
24   order to get those clients.  That is, it has to go out and
25   start, get a very small segment of the population and try to
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              23

6955CREC                   conference
```
 1   get their business and once it does that, it develops its own
 2   client lists and information about the client.  That is not the
 3   kind of information that anybody can find in the yellow pages
 4   and we would argue is some of the important secret protected
 5   material that Credit Suisse has within its banking units.
 6        MR. CURTLETT:  I would dispute the notion that names
 7   and addresses of customers are protected under the current
 8   state of the law.  I don't think they are.  And if --
 9        THE COURT:  Well, look, certainly --
10        MR. CURTLETT:  Your Honor, if I may.
11        THE COURT:  Ms. Carroll is not entitled to take with
12   her confidential information and trade secrets and that would
13   include, at least as this is currently phrased, information
14   regarding Credit Suisse customers, accounts, and market
15   research.  I think that's right.
16        And they don't have to know she took it but the bottom
17   line is I think those are, that does adequately describe what
18   trade secrets are.  And if she has it, she is going to have to
19   return it.
20        MR. CURTLETT:  Your Honor, we breezed past provision A
21   and if I could have a moment to respond to that?
22        THE COURT:  Sure.
23        MR. CURTLETT:  I think it is inappropriate to prevent
24   Ms. Carroll from continuing her work with Brown Advisory, and
25   the reason being an injunction is not an appropriate remedy
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              24

6955CREC                   conference
```
 1   where damages can ultimately be determined and calculated to
 2   remedy whatever losses may be suffering.
 3        THE COURT:  You are quite right there.  And I guess
 4   all I did earlier was summarize why I thought there was
 5   likelihood of success on the merits here based upon her
 6   conceded actions and the employment agreement that she signed.
```

Page 11

6955CREC.txt
```
 7          It seems to me pretty clear likelihood of success on
 8     the merits.  I have ruled on jurisdiction.  It seems to me that
 9     this is precisely the kind of case where you can have
10     irreparable harm, loss of good will.  You don't need any more
11     words than that.  You lose customers.  You have customers who
12     are wondering what is going on.  That's enough.
13          MR. CURTLETT:  That's precisely the reason, your
14     Honor, why Ms. Carroll should have an equal opportunity, as
15     Credit Suisse First Boston, to communicate with her customers
16     with whom she has a relationship that have worked with her for
17     years to explain exactly why it is that she's gone to work
18     somewhere else and then give them the opportunity.
19          THE COURT:  I am going to give you a preliminary
20     injunction hearing as quickly as you want one, okay?  But I
21     think they've made out irreparable harm and a likelihood of
22     success on the merits.
23          So, it is going to be up to you how fast you want to
24     proceed in this court on this issue.  You tell me when you want
25     to come in here with witnesses for preliminary injunction and I
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

25

```
6955CREC              conference
 1     will give you a date.
 2          MR. CURTLETT:  All right.  Thank you, your Honor.
 3          THE COURT:  Okay.
 4          In the meantime, I guess we better do that now.  What
 5     are we doing about a bond?  You didn't propose what you wanted
 6     to put on the table here.
 7          MR. BARNARD:  We didn't propose one, your Honor.  I
 8     don't know that I have the cases with me, but I believe the
 9     issue of a bond is, in this case, because we don't believe
10     there is any significant chance that the injunction granted
11     today or that might be granted as part of the preliminary
12     injunction motion would later be found inappropriate in light
13     of the controlling case law that we have cited in our moving
14     papers, we believe that the bond ought to be a nominal amount
15     and we believe also that there is a requirement in the case law
16     that the respondent here shows some sort of reason why there
17     needs to be something more than a nominal bond.
18          So, I don't know that we have the specifics on the
19     money, your Honor, but we believe it ought to be relatively
20     small.
21          THE COURT:  What has been bond in other cases?  You
22     have done this more than once, right?
23          MR. BARNARD:  I have, your Honor.  It's typically
24     been -- and I am going from memory -- but I think somewhere in
25     the neighborhood of somewhere between $5,000 and $10,000 has
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

26

```
6955CREC              conference
 1     been the range.
 2          THE COURT:  I was thinking $10,000, so that's what I
 3     am going to recommend.  I assume Credit Suisse can come up with
 4     that, which is another reason why you may not need a bond.
 5     But, in any event, you can post that prior to 5:00 tomorrow?
 6          MR. BARNARD:  We shouldn't have any problem doing
 7     that, your Honor.
 8          THE COURT:  So, that would be September 6, right?  At
 9     5:00 p.m.
10          You know, I will set a preliminary hearing date right
11     now.  Or do you want to send in a letter after you have had
                              Page 12
```

6955CREC.txt

```
12  some time to think about this and who you want to put on and
13  what you want to put on?
14          MR. CURTLETT:  I would appreciate that opportunity,
15  your Honor.
16          THE COURT:  You can tell me you want me to decide it
17  on the papers and briefing schedule if you don't want a hearing
18  with witnesses.
19          Are you accepting service, Mr. Curtlett, at this
20  point?
21          MR. CURTLETT:  I will.
22          THE COURT:  Okay.  So, we don't need a service
23  provision in here.  I am just going to put in that service of
24  the order to show cause, together with the papers, has been
25  made.
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              27

6955CREC                    conference
```
 1          All right, I have marked this up so badly I don't know
 2  if anybody will be able to read it.
 3                              o0o
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300