UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                 :

CREDIT SUISSE SECURITIES (USA) LLC,  :    No. 07 Civ. 8556

                    Petitioner,    :

        -against-            :

JOHN L. SULLIVAN II,           :

                  Respondent.   :

---------------------------------------------------------- x

**DECLARATION OF CAREY H. TIMBRELL IN SUPPORT OF
PETITIONER'S EMERGENCY MOTION FOR INJUNCTION IN AID OF
ARBITRATION**

CAREY H. TIMBRELL declares pursuant to 28 U.S.C. § 1746:

1.      I am employed in San Francisco, California as a Managing Director and Regional Office Manager of the Private Banking USA business at Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC, "Credit Suisse" or "Petitioner"). I have been in the financial services industry for over twenty-five (25) years, most recently with Credit Suisse and, prior to that, with Goldman Sachs & Co. As a Regional Office Manager of Credit Suisse, my duties include supervising the account executives – such as Respondent John L. Sullivan II ("Sullivan") – who work at 650 California Street, San Francisco, and ensuring that they conduct themselves in accordance with Credit Suisse policies.

2.      I make this declaration in support of Petitioner's emergency application for an injunction in aid of arbitration by order to show cause in the above-captioned action against Respondent. I have personal knowledge of the facts set forth herein except where stated to be on information and belief, in which case, I believe those facts to be true.

3.     Credit Suisse is, and at all relevant times has been, one of the world's leading financial institutions and a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business at 11 Madison Avenue, New York, New York. Credit Suisse is engaged in the business of selling investment products and providing financial services to its clients. Credit Suisse is a NASD member company.

4.     Sullivan was a Director employed in the San Francisco office of Credit Suisse's Private Banking USA business ("Private Banking"), and he resides in Atherton, California. Sullivan is registered with the NASD (now known as FINRA) as a broker employed by Credit Suisse, and, on information and belief, he has been employed with Credit Suisse as of February 1999.

5.     On September 27, 2007, Sullivan abruptly purported to resign effective immediately and accept employment with Jefferies, one of Credit Suisse's competitors, in blatant violation of several contracts that collectively require him (a) to provide sixty (60) days' notice before terminating his employment; (b) to refrain from engaging in competitive activity for thirty (30) days following the effective termination of his employment; (c) to refrain from soliciting any of Credit Suisse's clients or employees for sixty (60) days following the effective termination of his employment; and (d) to refrain from misusing Credit Suisse's confidential information. In exchange for these commitments, Credit Suisse paid Sullivan a lump sum of $75,000 in the form of a forgivable loan (all of which has been forgiven) and also compensated him handsomely – paying him over $350,000 in 2006 alone. A true and copy of Sullivan's letter of resignation is annexed hereto as <u>Exhibit A</u>.

6.     That same day, a valued Credit Suisse employee, Anne Dietrich, who served as a Sales Assistant to Sullivan at Credit Suisse, resigned with him to go to Jefferies, also effective

immediately.  A true and copy of Dietrich's letter of resignation is annexed hereto as <u>Exhibit B</u>.

7.     I promptly called Sullivan to ask him about his intentions after I learned of the group resignation, and specifically reminded him of his covenants with Credit Suisse, as set forth above.  In that conversation, he told me that Jefferies was paying him a lump sum approximately equal to twice the revenue of all of the Credit Suisse clients he serviced for Credit Suisse, or, by extrapolation, a total figure approaching $2 million.  In other words, he revealed that Jefferies had made a huge seven-figure payment to him based on the implicit understanding that he would make every effort to convince all of the Credit Suisse clients that he serviced for our firm to move with him to Jefferies.  Though I was naturally concerned about this payment, especially in light of the obviously coordinated nature of his and Dietrich's departures, Sullivan told me, in no uncertain terms, that he understood he was obligated to comply with his restrictive covenants as set forth above, and he promised me that he would abide by them.  I took Sullivan at his word and relied on his promise to me.

8.     I also understand that on September 28, 2007, his new employer, Jefferies, provided additional assurances to Credit Suisse's in-house counsel that Sullivan was not yet working at Jefferies and that Jeffries would immediately inform Credit Suisse if Sullivan or Jefferies were to take a position at odds with Sullivan's prior assurances that he would comply with his covenants with Credit Suisse, in which case Jefferies would seek an amicable resolution.  In other words, Jefferies led Credit Suisse to believe that Sullivan would continue to comply with his obligations pending further discussions.

9.     Contrary to these representations, late in the day on October 1, 2007, Jeffries counsel called to inform us that Sullivan had commenced work and was actively soliciting Credit Suisse clients.

10.    The violations of Sullivan's contractual and other obligations to Credit Suisse are currently the subject of arbitration and mediation proceedings that have been commenced by Credit Suisse. However, we are here before the Court because we have now learned that, in addition to Sullivan's solicitation of Credit Suisse employees, his breach of his covenants to Credit Suisse and the breaking of his promise to me, Sullivan has taken valuable Credit Suisse confidential, proprietary and trade secret information, which he undoubtedly intends to use in his new position at Jeffries to solicit Credit Suisse clients and otherwise to unfairly compete against Credit Suisse. His motivations are obvious given the seven figure payment he received from Jefferies which was plainly tied to his efforts to misappropriate business and client relationships from Credit Suisse.

11.    In light of the discovery that we had been misled about Sullivan's intentions to comply with his commitments to Credit Suisse, our firm conducted an investigation into his departure. During the course of that investigation, we have located several emails and videotapes indicating that his actions are far more nefarious than we initially believed. Not only did Sullivan actively solicit Credit Suisse clients and at least one employee before his departure, as emails have revealed, but videotape evidence that we have pulled and reviewed only recently indicates that he took significant amounts of confidential, proprietary and trade secret Credit Suisse information from Credit Suisse's offices two days before his resignation, when he was still a trusted Credit Suisse Director. Videotape evidence reveals that Dietrich, at the direction of Sullivan, on information and belief, likewise copied and misappropriated Credit Suisse proprietary, confidential and trade secret information from our firm in the hours before her resignation which she tendered only after having managed to conceal several files in her bags believed to be proprietary and confidential to Credit Suisse.

**Sullivan's Wrongful Solicitations**

12.    Since Sullivan's departure, I have reviewed documents demonstrating that prior to giving notice of his resignation, while he was still a trusted Director of our firm, Sullivan used his Credit Suisse email account to solicit several Credit Suisse clients and at least one employee (but believed to be several employees) to leave the firm to join him at Jefferies. The specific emails he sent on September 27, 2007, attached an article from several days earlier praising Jefferies' business, and were thus clearly sent for the purposes of prohibited solicitation. Demonstrating the effectiveness of his solicitations, several clients have decided to move their business away from Credit Suisse to Jefferies following Sullivan's departure and, of course, Dietrich determined to leave the firm to accompany him to Jeffries as well.

**Sullivan's Misappropriation of Credit Suisse's Proprietary and Confidential Information**

13.    In the wake of Sullivan's and Dietrich's coordinated departures from Credit Suisse and the discovery of Sullivan's prohibited solicitations of clients and employees, we determined through electronic security records that Sullivan had entered our offices on September 25, 2007, several times, well after the close of business when the office is normally empty. Specifically, these records show repeated entries by Sullivan into our offices between the hours of 7 p.m. and as late as 10 p.m. in the evening. Given that our office is generally empty after 5:30 p.m. (especially since we are on the West Coast and, as a New York-centric office, we keep largely New York office hours[1]), and Sullivan has not been known to be a late worker (which is unsurprising, given that he lives over an hour away from the office by car), these office entries alone, given their proximity to Sullivan's and Dietrich's departure, was cause for concern. It is now clear, unfortunately, that this concern was well founded.

---

[1] For example, our office meetings are typically held at or before 8 a.m., or just after the market closes (not later than 2 p.m.), and our office managers' working hours are from 5 a.m. until 2 p.m. Similarly, our office receptionists' hours are generally from 6 a.m. to 4 p.m.

14.     Our office security videotape, which I have viewed, confirms that Sullivan entered Credit Suisse's offices on September 25, 2007 – two days before resigning – at approximately 7:30 p.m. for the apparent purpose of misappropriating files from Credit Suisse. The security videotape is routinely maintained as part of normal business operations as is commonly known to all employees in our offices at 650 California Street. The cameras are contained in standard black hemispheres in various locations around the office.

15.     Sullivan's actions, as captured on video camera, speak volumes. First, he entered the office using the back hallway, toting a large wheeled bag, and then quickly entered our copy room, where he stowed the large bag while he walked around the office in an apparent effort to ensure that no one happened to be working late and might observe his actions. He then went back to the copy room, collected the bag and went straight to his desk, where he worked for approximately 10 minutes emptying the files from his desk and credenza into the bag.

16.     It was also of interest that, as the videotape reveals, Sullivan did not take his personal property with him. Instead, he left these materials, including a Stanford coffee cup, many personal greeting cards and other items on his desk after his departure. Indeed, he appears to have purposefully left his personal items there to cover up for the Credit Suisse documents he had taken. For example, the videotape reveals that among the other volumes of files he misappropriated, he cleaned out numerous documents from his large top left drawer and placed them into his roller bag. Then, upon inspecting the empty drawer, Sullivan can be seen placing a large box of greeting cards into that top left drawer, presumably so that its emptiness would not arouse suspicion. I believe that his actions in moving other files around on his desk were likewise intended to obscure the fact that volumes of materials had been taken.

17.     Sullivan's consciousness of guilt is further revealed in that, just before leaving the office with his cache of misappropriated documents, the videotape shows that he attempted to sign into Credit Suisse's internal computer network. On the tape, he apparently becomes impatient and does not wait for the log-on to be completed, presumably because he was eager to leave the office without being possibly detected.

18.     On information and belief, security videotape maintained by our building's security, which monitors entries and departures from our building, shows Sullivan leaving the building with his roller bag full of Credit Suisse files, minutes after departing our offices.

19.     I have also viewed a videotape of Dietrich during the hours before she purported to tender her resignation on September 27, 2007. On that day, Dietrich stayed in the office until 5 p.m., which was extremely rare as, on information and belief, she usually left the office by 3 p.m. The videotape reveals that that afternoon, however, after I observed her make several trips, with what appear to be Credit Suisse client account files in hand between her desk and the copy room, Dietrich then, before resigning, placed at least two stacks of documents into her bags. Having done that, at approximately 5 p.m., after I had left the office for the day, she tendered her resignation and, on information and belief, left the office with her bags.

20.     Taken together with Sullivan's surreptitious misappropriation of documents from Credit Suisse, I believe that Sullivan was engaged in a concerted effort to misappropriate Credit Suisse confidential, proprietary and trade secret information in order to use it to unfairly compete against Credit Suisse in his new position at Jeffries.

21.     Sullivan, like all of the Relationship Managers in our office, and Dietrich, as a Sales Assistant, were trusted to maintain working client files at their desks to permit them to do their jobs. Among such files, would be client lists, client contact information, client account and

holding information, confidential market research developed by Credit Suisse for Relationship

Managers to use in servicing clients, and information concerning the investment strategies

offered or intended to be offered to clients. All of this information is compiled with great time,

effort, and expense, and constitutes the life blood of our business. The information is

particularly sensitive and confidential, and should not be shared with any competitor, because it

would provide the competitor with an unfair advantage in remaining one step ahead of Credit

Suisse at each turn. Specifically, a competitor could use this information to see who we market

to, capitalize upon our historic knowledge of our clients, destroy the goodwill we built, and call

on clients to solicit them away from Credit Suisse. In reviewing the contents of Sullivan's desk

and credenza, and that of Dietrich, after their departure and taking of files, I found, much to my

dismay, that, with the exception of a handful of documents, essentially no documents in these

sensitive categories were left behind.

      22.    Credit Suisse maintains company policies advising employees of their obligations

to safeguard the company's assets and confidential and proprietary information, both during

employment and following departure from Credit Suisse. To further maintain the confidentiality

of such information, Credit Suisse protects its physical offices by electronic security systems as

well as conventional locks. It safeguards its electronic data and information by means of

electronic security measures. Access to account information and other financial information

about a specific customer is limited to the registered representatives responsible for managing

that customer's investment accounts. Access to electronic data and information is by individual

password only. No employees of Credit Suisse are authorized to keep or maintain personal

records concerning customers or to take any other customer information with them when they

resign from employment.

23.     Neither Sullivan nor Dietrich is authorized to take confidential information or materials from Credit Suisse.  The Credit Suisse U.S. Employees Handbook (the "Handbook"), that both Sullivan and Dietrich promised to abide by, specifically provides that:

> "all information that is confidential or proprietary to Credit Suisse must be used solely in connection with an employee's official capacity at Credit Suisse.  Such information must never, under any circumstances, be used for personal gain or for the gain of any third party, including members of the employee's family or household.  After they leave the Firm, employees are prohibited from using any of the Firm's confidential and proprietary information for any purpose and from disclosing such information to any person.  Information may be confidential or proprietary to Credit Suisse whether it is contained in written materials such as memoranda or other documents, is generated or stored in electronic form or magnetic form, or is in unrecorded form."

> See Exhibit C hereto.

24.     During his employment with Credit Suisse, Sullivan annually agreed to be bound by and follow all of Credit Suisse's employment-related policies, including those set forth in the Handbook.  Sullivan most recently indicated his agreement to be bound by Credit Suisse's policies on November 28, 2006, when he electronically signed a certification to that effect.   A true and correct copy of Sullivan's electronic certification for 2006 is annexed hereto as Exhibit D.

25.     Dietrich is subject to the same confidentiality obligations as Sullivan, as she certified compliance with the Handbook and is also subject to a confidentiality agreement contained in her offer letter, in addition to her fiduciary obligations to the firm not to misuse firm materials.  True and correct copies of Dietrich's electronic certification for 2006 and her offer letter are annexed hereto collectively as Exhibit E.   If Sullivan and anyone else working with him, such as Dietrich, are permitted to retain such information, or, worse, use it at their new employer, Credit Suisse's and its clients' information will continue to remain unprotected, and

9

will more than likely be misused. Indeed, it is inconceivable that Sullivan or Dietrich would have taken information if they did not intend to use it.

26.     I am aware that significant Credit Suisse client relationships serviced by Sullivan were developed by Credit Suisse without Sullivan's assistance, and placed into Sullivan's care as a trusted Private Banking employee, or were developed by Sullivan while at Credit Suisse with the firm's support. Indeed, based on Sullivan's own figure, as reflected in a note that he submitted to me during the process of his recruitment to initially join Credit Suisse, before coming to Credit Suisse he serviced only approximately $39 million in client assets, whereas as of the date of his notice of resignation he serviced Credit Suisse client assets of over $125 million. A true and correct copy of Sullivan's note is annexed hereto as Exhibit F. In fact, Sullivan played essentially little to no role in the establishment of the client relationships representing approximately $60 million. For him to now seek to convert those relationships to Jefferies based on his use of misappropriated confidential and proprietary information is thus particularly egregious.

27.     By misappropriating confidential information to be used for soliciting Credit Suisse's clients and employees, and otherwise unfairly competing against Credit Suisse, Sullivan clearly has engaged in unfair competition and conversion of Credit Suisse's property.

**Sullivan's Arbitration Agreement**

28.     Since 1998, Credit Suisse has maintained an Employment Dispute Resolution Program (the "EDRP"), a copy which is annexed hereto as Exhibit G. By its express terms, the EDRP is the exclusive means for resolving any and all "Employment-Related Claims" that arise between Credit Suisse and its employees and former employees.

29.    "Employment-Related Claims" are defined in the EDRP to include "[a]ll present and future claims against [Credit Suisse] by an employee" that "relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing, and . . . assert the violation or infringement of a legally protected right."

30.    The EDRP provides that Employment-Related Claims shall be resolved through a three-step process. The first step requires the aggrieved party to file an internal grievance if appropriate. If the grievance is not resolved, the party may initiate non-binding mediation before a mediator supplied by JAMS. If mediation is not successful, the employee or Credit Suisse may initiate arbitration before one of three arbitration providers: the American Arbitration Association, the CPR Institute for Dispute Resolution, or JAMS. Absent a mutual agreement to arbitrate elsewhere, arbitration under the EDRP must take place in the New York metropolitan area, and the arbitrator must apply New York law.

31.    All United States-based Credit Suisse employees are required as a condition of employment to agree to abide by the EDRP. Sullivan did so expressly on August 9, 2001, by signing an Agreement to Use Employment Dispute Resolution Program Procedures. See Exhibit H. Additionally, the certifications which Sullivan executed in the course of his employment (see Exhibit D) include a statement that he agreed to abide by any applicable employment dispute resolution program.

32.    Credit Suisse's claims against Sullivan for violating his confidentiality obligations to Credit Suisse are within the scope of the EDRP as they arise from his employment with Credit Suisse and the termination thereof. Credit Suisse's claims are thus arbitrable under the EDRP.

33.    Even if Credit Suisse's claims were not within the coverage of the EDRP, they would nonetheless be arbitrable under the NASD's Code of Arbitration Procedure, which provides that claims or disputes between or among NASD members and associated persons arising in connection with the employment or termination of employment of an associated person by a member shall be submitted to arbitration.

34.    On October 3, 2007, in compliance with the EDRP, Credit Suisse served requests for mediation and arbitration before JAMS upon Sullivan to seek resolution of certain claims arising out of his resignation from Credit Suisse and his subsequent conduct.  Sullivan ultimately refused to participate in mediation, and therefore, arbitration is underway.  True and correct copies of Credit Suisse's requests for mediation and arbitration along with an amendment to the request for arbitration are annexed hereto collectively as Exhibit I.

35.    Though Credit Suisse will proceed as quickly as reasonably possible, based on past experience, it will take a number of days to schedule and hold a mediation.  Then, there will be an additional period of time before the arbitration is held.  If Sullivan and anyone else working at his direction (such as Dietrich) are permitted to retain and use Credit Suisse's confidential, proprietary and trade secret information in the meantime, Credit Suisse will suffer substantial irreparable harm.  Specifically, Credit Suisse stands to lose its irreplaceable confidential, proprietary and trade secret information, not to mention its client and employee relationships and goodwill that it has spent years and substantial resources to grow and which constitute the very heart of its business.

36.    There is no adequate monetary remedy for such harm.

37.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
October 16, 2007

_____
Carey H. Timbrell

13

EXHIBIT A

John L. Sullivan II
29 Lloyden Drive
Atherton, CA 94027


September 27, 2007


Carey Timbrell
Credit Suisse
650 California Street
Suite 3100
San Francisco, CA 94108


Dear Carey:

Effective today I am submitting my resignation from Credit Suisse.  It was a
distinct pleasure to have worked for you and Credit Suisse.  I am greatful to
have worked for you.  I enjoyed it immensely and wish you the best.

Regards,

John L. Sullivan II

EXHIBIT B

Anne E. Dietrich
1269 Filbert Street
San Francisco, CA 94109


September 27, 2007


Credit Suisse
650 California Street
Suite 3100
San Francisco, CA 94109


To whom it may concern:

Effective immediately, please accept my resignation from Credit Suisse.


Sincerely,

*Anne E Dietrich*

Anne E. Dietrich

EXHIBIT C

 **CREDIT SUISSE**

Human Resc

Print  Close Wir

**This Handbook**
> Table of Contents
> Equal Employment
> Workplace Rules
> Job Performance
> Employment Status
> Employee Info
> Time Off
> Leaving Credit Suisse
> Other Policies
> Appendix A

## About This Handbook

This Handbook has been prepared to assist employees in understanding various employment-related policies, procedures, and practices that apply at Credit Suisse in the United States. It is intended as a general guide to the subjects that are covered. Credit Suisse reserves the right to supplement, amend, or withdraw this Handbook at any time, with or without advance notice; to determine how the terms of this Handbook apply in particular situations; and to resolve ambiguities in the terms of this Handbook.

Employees should note that this Handbook does not set out all of Credit Suisse's written employment-related policies and practices. Others are set forth in the Credit Suisse Global Compliance Policy Manual and in memoranda, compliance alerts, and departmental policy manuals that are from time to time distributed.

Questions about this Handbook should be referred to the Human Resources Department or the Legal and Compliance Department.

CREDIT SUISSE

Human Res(

Print    Close Wir

> This Handbook
> Table of Contents
> Equal Employment
> Workplace Rules
> Job Performance
> Employment Status
> Employee Info
> Time Off
  Leaving Credit Suisse
> Other Policies
> Appendix A

## Leaving Credit Suisse
VII. LEAVING CREDIT SUISSE

### A. Resignation

Because employment at Credit Suisse is at will, employees have the right to resign from Credit Suisse at any time, subject to the notice requirement applicable to certain employees and set out under "Notice Requirement" below. An employee who wishes to resign should deliver a resignation letter to his or her Department Manager, who should immediately inform the Human Resources Department. The Human Resources Department will schedule an exit interview with the departing employee. Employees not subject to the notice requirement described below are requested to give at least two weeks' notice of resignation.

### B. Termination by Credit Suisse

Because employment at Credit Suisse is at will, Credit Suisse may terminate the employment of any employee at any time, with or without cause or advance notice, except as required under "Notice Requirement" below. The Human Resources Department is responsible for reviewing, approving, and supervising all involuntary termination actions within the Firm.

### C. Notice Requirement

All employees who are at the level of Vice President or Director at the time of termination and were hired as or promoted to, Vice President or Director on or after September 1, 1998 are required to give Credit Suisse First Boston written notice of 30 calendar days before resigning from the employ of Credit Suisse unless the employee was a Director at the time of termination and was either (a) hired on or after January 1, 2005; or (b) was promoted to Director on or after January 1, 2006 regardless of date of hire in which case the employee is required to give written notice of 60 calendar days before resigning from the employ of Credit Suisse. All employees who are Managing Directors on, or become Managing Directors at any time after, January 1, 2005 are required to give Credit Suisse written notice of 90 calendar days before resigning from the employ of Credit Suisse. These provisions shall apply unless a longer period is required by applicable contract, agreement or policy. In addition, awards received under the Credit Suisse Group Master Share Plan may contain separate obligations. Credit Suisse will give all employees covered by this policy written notice of 30 calendar days before terminating their employment for any reason other than for cause.

During any notice period (whether notice was given by the employee or by Credit Suisse) the employee will continue to be an employee, will be required to assist Credit Suisse in the transition of his or her responsibilities, and will be entitled to continue to receive base salary and to participate in all benefit plans for which an employee at his or her level is eligible (but not to receive any incentive performance bonus that might otherwise be paid in respect of or during that period). Credit Suisse may require that the employee not come in to work during the notice period. In no event, however, may the employee perform services for any other employer during the notice period. Credit Suisse may, at its sole election, shorten the duration of the required notice period. If Credit Suisse shortens the notice period provided by an employee, Credit Suisse reserves the right, in its sole discretion, not to pay or provide benefits to the employee for any remaining notice period. If Credit Suisse shortens the notice period it is required to give to the employee, it will make a payment to the employee equal to the amount of base salary the employee otherwise would have earned during the unexpired notice period.

### D. Return of Company Property

A departing employee must return all Firm property in his or her possession, including, but not limited to, identification and access cards; keys; corporate credit cards; personal computers, printers, fax machines, modems, and portable telephones; client files and records; rolodex files and customer and client lists; and memoranda, reports, and other documents, and computer software, disks, and files. Departing employees must also submit an up-to-date accounting of expenses to the Department Manager. Departing sales personnel must provide their Department Manager with a description of pending sales, sales calls, sales leads, etc.

**E. Safeguarding of Confidential Information after Leaving**

Employees are prohibited from using any of the Firm's confidential and proprietary information for any purpose and from disclosing such information to any person after they leave the Firm. Upon their departure, regardless of the reason therefore, they may be required to sign a statement acknowledging that they understand and will comply with this rule.

**F. Prohibition on Solicitation of Employees, Consultants, Independent Contractors, Customers and Clients after Leaving**

After termination of employment for any reason, employees who at the time of their termination of employment were at the level of Vice President, Director or Managing Director, are prohibited from:

- directly or indirectly soliciting, inducing or encouraging any employee of Credit Suisse and its parents and affiliates (the "Group"), or any consultant or independent contractor providing services to the Group, to leave the Group or to join or perform services for any other company, or

- directly or indirectly soliciting, inducing or encouraging any entity or person who is a customer or client of the Group to cease to engage the services of the Group in order to use the services of any entity or person that competes directly with a material business of the Group, where the ~~relationship between the customer or client and the Group, is known by the employee as a result of his or her employment with the Group;~~

For this purpose, termination of employment occurs after expiration of any period of notice given or required to be given prior to resignation or a termination of employment by Credit Suisse. This provision shall apply for (i) 60 days after the termination of employment in the case of an employee who was a Managing Director at the time of termination of employment, or was a Director at the time of termination of employment and was either (a) hired on or after January 1, 2005; or (b) promoted to Director on or after January 1, 2006 regardless of date of hire; (ii) 30 days after the termination of employment in the case of an employee who was a Vice President at the time of termination of employment or was a Director at the time of termination of employment and was hired before January 1, 2005 and who became a Director before January 1, 2006, or (iii) in all cases, such longer period as required by applicable contract, agreement or policy. In addition, awards received under the Credit Suisse Group Master Share Plan may contain separate obligations.

**G. Payments by Credit Suisse**

It is not the policy of Credit Suisse to make severance payments to individuals whose employment has terminated. Credit Suisse may, at its sole discretion, enter into a written agreement with an individual whose employment has terminated pursuant to which it agrees to make a payment to the individual.

 **CREDIT SUISSE**

Human Resc

Print   Close Wir

> This Handbook
> Table of Contents
> Equal Employment
  Workplace Rules
> Job Performance
> Employment Status
> Employee Info
> Time Off
> Leaving Credit Suisse
> Other Policies
> Appendix A

## Workplace Rules
### II. WORKPLACE RULES

#### A. General Rules of Conduct

Credit Suisse expects employees to observe the same standards of integrity, professionalism, and ethical responsibility in their dealings with other employees as they are required to observe in their dealings with customers and clients. Employees are expected to treat their colleagues at all times with dignity, consideration, and respect; to refrain from any type of behavior that is inappropriate or offensive in the workplace; and to conduct themselves at all times in a professional manner.

These rules also extend to other work-related settings such as during business travel, meetings, business-related social events or client entertainment. Venues chosen for work related events, including client entertainment, should reflect Credit Suisse's stated goals of Diversity and Inclusion. This means that work-related activies, including client entertainment, that are inconsistent with a professional atmosphere that promotes equal employment opportunity or that are exclusionary with respect to any basis prohibited by Firm policy are strictly unacceptable. This includes patronizing, in connection with work-related activities, including client entertainment, at sexually explicit establishments, or facilities or clubs that limit or exclude participation in such activities based on an individual's gender, race, age, nationality, religion, sexual orientation, pregnancy, disability or other basis protected by Credit Suisse policy.

Employees must at all times comply with all rules, policies, and procedures of the Firm applicable to them, including those set out in the Credit Suisse Global Compliance Policy Manual, in this Handbook, and in memoranda, compliance alerts, and departmental policy manuals that are from time to time distributed.

#### B. Illegal Drugs, Controlled Substances, and Alcohol

The use of drugs or alcohol in the workplace seriously impairs the user's ability to perform in a professional and productive manner, puts the safety, health, and well being of other employees at risk, and threatens the reputation of the Firm. It is accordingly the policy of the Firm that no employee may possess, use, purchase, distribute, or sell illegal drugs or controlled substances, or have illegal drugs or controlled substances in his or her system during the workday, on the Firm's premises, or while conducting Firm business. Using or being under the influence of alcohol while on the Firm's premises or while conducting Firm business is similarly forbidden, except that reasonable consumption of alcohol at appropriate Firm events or in connection with client entertainment is not prohibited. If such events are to take place on Firm premises, they must take place in designated areas and be arranged by the Corporate Services Department.

To the extent consistent with applicable law, the Firm may require candidates for positions at the Firm to undergo scheduled or unscheduled testing for illegal drugs and controlled substances, and during the course of an employee's employment may from time to time require the employee to undergo additional testing. A job offer extended to a candidate may be canceled and the employment of an employee may be terminated if the candidate or employee refuses to undergo testing or if the test results are confirmed to be positive.

Counseling and rehabilitation services are available to employees through an Employee Assistance Program. If the Firm has recommended, for job-related performance reasons, that an employee enter into a treatment program and the employee refuses to do so or leaves the program before completing it, the employee will be subject to termination. Information about the Employee Assistance Program is available, on a confidential basis, from the Human Resources Department.

#### C. Safety and Health

The Firm is committed to doing all that is reasonably practicable as well as all that may be required by applicable law to protect the health of employees and ensure their safety while they are at work. If an employee should become aware of any condition that may make the workplace unsafe or unhealthy, he or she should immediately report it to management or to the Corporate Services Department.

## D. Security

Employees are expected to comply with all security-related rules and procedures applicable at their location, including any requirement that they show a pass, sign in, or use an access card to enter the Firm's premises and any requirement that non-employees not be permitted to enter except with authorization. If an employee sees an individual on the premises who appears to be present without authorization, he or she should immediately report the matter to the Security Department.

The Firm does not accept responsibility for personal articles left in offices. Art pieces belonging to individuals are not insured under the Firm's insurance policies. If an employee has brought in personal property that could appear to be office property, the employee should obtain a pass from the Security Department before removing it from Firm premises.

## E. Safeguarding of Firm Assets

Employees are required to safeguard the assets of Credit Suisse and are prohibited from using them for any purpose other than in connection with the business of Credit Suisse. The following rules apply in particular:

1. **Confidential and Proprietary Information**
   As explained in more detail in the Credit Suisse Global Compliance Policy Manual, all information that is confidential or proprietary to Credit Suisse must be used solely in connection with an employee's official capacity at Credit Suisse. Such information must never, under any circumstances, be used for personal gain or for the gain of any third party, including members of the employee's family or household. After they leave the Firm, employees are prohibited from using any of the Firm's confidential and proprietary information for any purpose and from disclosing such information to any person. Information may be confidential or proprietary to Credit Suisse whether it is contained in written materials such as memoranda or other documents, is generated or stored in electronic form or magnetic form, or is in unrecorded form.

2. **Inventions**
   All inventions, discoveries, concepts, and ideas, and expressions thereof, whether or not copyrightable or patentable, including articles, processes, methods, formulas, systems, and techniques and related know-how, which an employee conceives or develops or first puts into practice, alone or with others, in connection with his or her employment ("inventions") are the exclusive property of Credit Suisse. Employees must disclose all inventions for which they are responsible to the Firm, and must assist the Firm in taking all actions reasonably requested by the Firm to perfect or establish the Firm's ownership of such inventions or to obtain patents or establish copyright protection.

3. **Firm Services and Facilities**
   Services provided by the Firm, such as mail, courier, purchasing, and travel services, and office supplies, equipment, and facilities provided by the Firm, including electronic facilities such as electronic mail and voice mail, are to be used exclusively for authorized corporate purposes. Their use for personal purposes is prohibited. This prohibition extends to use of and access to the Internet, which similarly may be used and accessed only for authorized corporate purposes and in no event for personal purposes. An exception is made for personal use of the telephone if calls are confined to those that are essential.

   Credit Suisse may, at any time and without any notice to any employees or other persons, monitor, read, inspect, and save any information transmitted or stored through or on any of the Firm's electronic systems and may disclose such information to law enforcement officials or other third parties.

   Employees are considered to have waived any right to privacy they might otherwise have to such information and to have consented to the Firm's engaging in such activities.

4. **Non-Interference with Relationships; Non-Solicitation of Customers, Clients, Employees, Independent Contractors and Consultants**
   The assets of Credit Suisse that employees must safeguard also include Credit Suisse's relationships with its customers, clients, employees, consultants and independent contractors. Employees may use these assets only in connection with their employment at Credit Suisse, and never for their personal benefit or for the benefit of a third party. Employees must avoid conduct that could interfere with Credit Suisse's relationship with any customer, client, prospective customer or prospective client or with any employee or other individual associated with Credit Suisse, including any consultant or independent contractor. For purposes of this section, the term Credit Suisse shall include its parents and affiliates. See also "Prohibition on Solicitation of Employees, Consultants, Independent Contractors, Customers and Clients after

Leaving" in Part VII below.

## F. Working Hours

Employees' working hours will be determined by their Department Managers, based on the specific needs of the department and the employee's job function. Employees are expected to maintain exemplary records of attendance and punctuality. Employees are expected to work overtime when their managers determine their doing so is necessary and request them to do so.

## G. Loans between Employees

Financial dealings between employees are discouraged. No employee may lend money to, or borrow money from, an employee whom the first employee supervises.

## H. Dress Code

Credit Suisse employees are expected to dress in a manner that is suitable for a business environment. "Casual" wear may be permitted on certain days in accordance with rules established by particular departments.

## I. Romantic or Sexual Relationships between a Supervisor and a Subordinate

Intimate or sexual relationships between two employees one of whom reports directly or indirectly to the other may impair, or may be perceived as impairing, the supervisor's ability to make fair decisions with respect to such matters as job assignments, job advancement, and compensation of the subordinate and of other employees. Such relationships also put undue and unnecessary pressure on both employees' professional relationships with their other colleagues at the Firm, and particularly with other colleagues in the same department. Such relationships are therefore prohibited. As leaders and role models, Managing Directors are subject to the most stringent standards and workplace codes of conduct. For purposes of this policy, a Managing Director will therefore be considered to be the supervisor of all employees in subordinate positions within his or her department. Furthermore, if a Managing Director enters into an intimate or sexual relationship with someone in another department who does not have a reporting line to the Managing Director, the Managing Director must report that relationship to Human Resources so that Human Resources can review the situation.

## J. Grievance Procedures

If an employee wishes to file a complaint about any aspect of his or her job, including compensation, promotion, discipline, transfer, or re-assignment, he or she should promptly bring the problem to the attention of an appropriate person at Credit Suisse. Generally the first person an employee speaks to about such a problem should be the employee's immediate supervisor, who, because he or she is most familiar with the employee's working situation, is likely to be best qualified to deal with the problem. The employee may also, however, speak to others with whom he or she feels comfortable speaking and who he or she believes are in a position to handle the matter responsibly; for example, an appropriate person above the supervisor in the department's chain of command; a departmental administrator; or a member of the Legal and Compliance Department. In addition, an employee may always, in any situation at any point in the process, contact his or her Human Resources Department representative to discuss such a matter. Both the Global Human Resources Website and the "HR Product and Support Contacts" page in the Telephone Directory identify the Human Resources representatives for the various departments of the Firm.

Any supervisor or other employee who receives a report of an allegation of illegal discrimination, harassment, or retaliation should immediately forward the report to the Human Resources Department. Any dispute involving a claim of illegal discrimination, harassment, or retaliation that is not resolved pursuant to the foregoing procedures must be resolved pursuant to the Credit Suisse Employment Dispute Resolution Program described below. As a matter of Credit Suisse policy, all employment-related issues that are raised in connection with the foregoing procedures are to be handled confidentially to the extent reasonably practicable under the circumstances.

## K. Employment Dispute Resolution Program

Credit Suisse has adopted an Employment Dispute Resolution Program that provides that all employment-related claims a U.S.-based employee may at any time have against Credit Suisse, including any arising in connection with his or her application for employment, employment, or termination of employment, must be resolved through a three-step process consisting of the internal

grievance procedure described above; mediation before an outside service provider; and (in the case in which a claim is not resolved through the first two steps) binding arbitration before one of three outside service providers in accordance with its arbitration rules as then in effect. An employee may not sue in court as to these claims.

The types of claims covered by the Employment Dispute Resolution Program include all employment-related claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Equal Pay Act, the Americans with Disabilities Act, the Employee Retirement Income Security Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Family and Medical Leave Act, the Older Workers Benefits Protection Act, or any other federal, state, or local statute, ordinance, regulation, or common law rule or decision regarding employment discrimination, civil rights, human rights, conditions of employment, or termination (including manner of termination) of employment, as the foregoing may from time to time be amended. Claims for workers' compensation and claims for unemployment benefits are not covered.

A copy of a Statement of Policy describing the Employment Dispute Resolution Program has been provided to every U.S. employee and is given to every new U.S. employee. A copy is also included in this Handbook, as **Appendix A**.

http://inside.csfb.net/content/hr/Americas/links/employee_handbooks/am_employeehandbook...    page1of1

 **CREDIT SUISSE**

Human Res

Print  Close Wir

> This Handbook
> Table of Contents
> Equal Employment
> Workplace Rules
> Job Performance
> Employment Status
> Employee Info
> Time Off
> Leaving Credit Suisse
> Other Policies
  Appendix A

**Appendix A**
US Employee Handbook: Appendix A

**US Employment Dispute Resolution Program**

- Employment Dispute Resolution Program
- Q&As

EXHIBIT D

# Compliance Online Requirements for 2006
*(including the 2006 Compliance Certification)*

# Sullivan II, John L

Employee ID #43LX                 Passed on November 28, 2006



CREDIT SUISSE    **Learning Management System**   User:JENNY CROSSMAN Role: Admin

Compliance Online Requirements for 2006 History For: SULLIVAN II, JOHN L.

3 result(s) found.
Pages:  1

| Modified By | Modified Date | Status | Status Effective Date | Price | Final Price | Currency | Undone |
|---|---|---|---|---|---|---|---|
| SULLIVAN II, JOHN L. | 11/28/2006 | Pass | 11/28/2006 | | 0.00 | | |
| SULLIVAN II, JOHN L. | 11/14/2006 | In Progress | 11/14/2006 | | 0.00 | | |
| Interchange, | 10/19/2006 | Pre Registered | 10/19/2006 | | | | |

3 result(s) found.
Pages:  1

Please note that the **Compliance Online Requirements for 2006** were comprised of three components:

 ♦ Bank Compliance Manual
 ♦ Money Laundering Prevention
 ♦ 2006 Compliance Certification

# ANNUAL COMPLIANCE CERTIFICATION 2006

As a part of your on-going obligations as an employee at Credit Suisse, you are asked to read the Annual Compliance Certification and acknowledge that you have reviewed or am familiar with the Bank Compliance Manual and together with other applicable compliance manuals and policies and Credit Suisse's employment-related rules and policies applicable to your location, and to agree to conduct yourself in and your business accordingly.

Please review this Certification carefully. The various manuals, policies, programs and other documents referenced in this Certification form can be accessed by clicking the appropriate links.

To view the Certification in PDF format in Portuguese, Russian, Japanese or Korean, click on the language above in the resource bar.

1. I have reviewed or am familiar with Credit Suisse's Bank Compliance Manual and applicable compliance manuals and policies, and I agree to abide by them as well as any applicable regulatory standards (for the manuals and related documents that apply click here to see the Code of Conduct InfoCenter). In particular, I am familiar with and agree to abide by Credit Suisse's policies and procedures on confidential and/or inside information and information barriers, and I am aware of the duties governing receipt of confidential and inside information and of the sanctions resulting from the misuse or improper distribution of such information.

Click here (http://infocenter.csintra.net/US/ProtectConduct)

2. Nothing has come to my attention during the certification period that leads me to believe that any of my activities, or the activities of any other Credit Suisse employee, violated Credit Suisse policies or any applicable legal, regulatory or ethical standards. This certification does not include any issues that I know have already been brought to the attention of my supervisor and/or LCD. I agree to promptly report to my supervisor or LCD (or, when appropriate, the Integrity Hotline) any conduct of which I become aware that may violate Credit Suisse policies or legal, regulatory or ethical standards.

3. I have reviewed and am familiar with Credit Suisse's employment-related rules and policies applicable to my location and Division and I understand and agree to abide by them. These include, without limitation, all rules and polices relating to equal employment opportunity and prohibiting discriminatory practices, and the provisions of any applicable employment dispute resolution program and/or rules relating to notice of resignation and non-solicitation (click here to see applicable Credit Suisse's Human Resources policies and handbook).

Click here (http://csintra.net/hr/index.html)

EXHIBIT E

# Compliance Online Requirements for 2006
*(including the 2006 Compliance Certification)*

# Dietrich, Ann

Employee ID #QW31

Passed on January 24, 2007



Please note that the **Compliance Online Requirements for 2006** were comprised of three components:

- ♦ Bank Compliance Manual
- ♦ Money Laundering Prevention
- ♦ 2006 Compliance Certification

# ANNUAL COMPLIANCE CERTIFICATION 2006

As a part of your on-going obligations as an employee at Credit Suisse, you are asked to read the Annual Compliance Certification and acknowledge that you have reviewed or am familiar with the Bank Compliance Manual and together with other applicable compliance manuals and policies and Credit Suisse's employment-related rules and policies applicable to your location, and to agree to conduct yourself in and your business accordingly.

Please review this Certification carefully. The various manuals, policies, programs and other documents referenced in this Certification form can be accessed by clicking the appropriate links.

To view the Certification in PDF format in Portuguese, Russian, Japanese or Korean, click on the language above in the resource bar.

1. I have reviewed or am familiar with Credit Suisse's Bank Compliance Manual and applicable compliance manuals and policies, and I agree to abide by them as well as any applicable regulatory standards (for the manuals and related documents that apply click here to see the Code of Conduct InfoCenter). In particular, I am familiar with and agree to abide by Credit Suisse's policies and procedures on confidential and/or inside information and information barriers, and I am aware of the duties governing receipt of confidential and inside information and of the sanctions resulting from the misuse or improper distribution of such information.

2. Nothing has come to my attention during the certification period that leads me to believe that any of my activities, or the activities of any other Credit Suisse employee, violated Credit Suisse policies or any applicable legal, regulatory or ethical standards. This certification does not include any issues that I know have already been brought to the attention of my supervisor and/or LCD. I agree to promptly report to my supervisor or LCD (or, when appropriate, the Integrity Hotline) any conduct of which I become aware that may violate Credit Suisse policies or legal, regulatory or ethical standards.

3. I have reviewed and am familiar with Credit Suisse's employment-related rules and policies applicable to my location and Division and I understand and agree to abide by them. These include, without limitation, all rules and polices relating to equal employment opportunity and prohibiting discriminatory practices, and the provisions of any applicable employment dispute resolution program and/or rules relating to notice of resignation and non-solicitation (click here to see applicable Credit Suisse's Human Resources policies and handbook).



*QW 31*

**CREDIT SUISSE SECURITIES (USA) LLC**
650 California Street          Tel      1 415 249 2000
San Francisco, CA 94108        Toll Free 1 800 227 4492
                               www.credit-suisse.com

July 11, 2006

*OFLTR*

Ms. Anne Dietrich

1059 Union Street, Apt. D

San Francisco, CA 94133

Dear Anne:

We are pleased to offer you a position with Credit Suisse Securities (USA) LLC (the "Company")
as a Sales Assistant in Private Banking USA on the following terms and conditions.

1.  Your employment with the Company is expected to commence on July 24, 2006. During
    your employment with the Company, you will receive a base salary at an annual rate of
    $42,000.00, payable from and after your start date and in accordance with the
    Company's standard policies and procedures.

2.  Your new position is eligible for overtime pay. As a result, you are entitled to receive
    overtime pay at the rate of 1½ times your "regular rate" for all hours worked in excess of
    40 hours in a workweek, hours worked in excess of 8 hours up to and including 12 hours
    per workday, and the first 8 hours worked on the seventh consecutive day of work in a
    workweek. Your position also entitles you to receive overtime pay at the rate of 2 times
    your "regular rate" for all hours worked in excess of 12 hours in a workday and for all hours
    worked in excess of eight on the seventh consecutive day of work in a workweek. You
    may no longer be entitled to overtime pay if your position changes. Any overtime pay you
    receive in any year will be considered part of your total compensation for that year.

3.  All amounts of compensation paid to you shall be paid subject to applicable taxes and
    deductions.

4.  The Company offers its employees an opportunity to choose from or to elect a
    comprehensive benefits program including, health, dental, life, and disability insurance
    coverage and the opportunity to participate in an Employee Savings and Retirement Plan.
    These benefits will be reviewed with you during your Orientation Program. The Company
    reserves the right to amend, modify or terminate any or all of its benefit and compensation
    plans and programs at any time in its sole discretion, as well as all other plans and
    programs of the Company with or without notice. Nothing in this letter should be
    construed as a guarantee of any particular level of benefits or of your participation in any
    benefit plan.

5.  If you elect them, life insurance, medical and dental coverage begin on your first day of
    employment. Long-term disability becomes effective the first day of the month after
    completion of three full months of employment.

6.  This offer is not a guarantee, and nothing in this offer should be construed as a guarantee,
    of employment for a specific period of time. You will be an employee at will and you or the
    Company may terminate the employment relationship between you and the Company at
    any time with or without cause or notice, except for any notice required pursuant to the

1

0987 –1407

Company's written policies applicable to you. As an employee you will be required to observe the policies published from time to time for the Company's employees, including in the Credit Suisse Global Compliance Policy Manual and the U.S. Employment Policies and Practices Handbook.

7. All U.S. employees are subject to the Credit Suisse U.S. Employment Dispute Resolution Program, as amended from time to time (the "Program") (formerly called the Credit Suisse First Boston Employment Dispute Resolution Program). The Program provides that all employment-related claims, including all statutory claims, an employee may at any time have are to be resolved through a three-step process consisting of an internal grievance procedure; mediation before an independent service provider; and (in the case in which a claim is not resolved through the first two steps) binding arbitration before one of three independent service providers in accordance with its arbitration rules. Any disputes arising hereunder shall be resolved in accordance with such Program. A copy of the Program as currently in effect is annexed hereto.

8. You acknowledge that during your employment with the Company you may have access to, become familiar with, create or be in possession of information of a confidential or proprietary nature which relates to the Company or its parents and affiliates (the "Group"). Such information includes, without limitation, the Group's client lists; its trade secrets; any confidential information about or provided by any client or prospective or former client of the Group; information concerning the Group's or any client's or customer's business or financial affairs, including its financial books and records, commitments, procedures, plans and prospects, financial products developed by it, its securities positions, trading strategies, and current or prospective transactions or business, employee compensation, any "inside information", and any other information that has been developed by or for the benefit of the Group, regardless of how such information is kept whether in hard copy or electronic form ("Confidential Information"). During and after the term of your employment with the Company, you agree to refrain from disclosing, directly or indirectly, or using in any way the Confidential Information, specifically including (without limitation) non-public information about transactions and proposed or contemplated transactions for Group customers and clients to which you will necessarily have access because of the nature of your employment with the Company and also the terms and conditions of this letter. You specifically recognize that disclosure of Confidential Information in violation of this paragraph could cause material and irreparable harm to the Group and that violation of this commitment could result in a termination of your employment for cause.

Furthermore, you agree that all tangible material containing Confidential Information, whether created by you or others, which shall come into your possession or custody during your employment, shall be and is the exclusive property of the Company. Upon leaving employment with the Company for any reason, you must immediately return to the Company all Group property in your custody or possession, including but not limited to, any and all documents or other materials (or copies of such documents or materials) evidencing or containing Confidential Information.

9. You represent, warrant and agree that (i) you have not taken and will not take, and/or will return or (with the consent of your former employers) destroy without retaining copies, all proprietary and confidential materials of your former employers; and (ii) you will not use any confidential, proprietary or trade secret information in violation of any contractual or common-law obligation to your former employers.

2

10. This offer of employment is contingent upon the following conditions.  If you fail to satisfy any of the conditions, the Company reserves the right to rescind any outstanding offer of employment or terminate your employment without notice and you will not be entitled to receive any amounts hereunder or under any other Company plan or program (other than base salary for days actually worked) including, without limitation, any severance pay:

    (a) The correctness of your representations and warranties contained in this offer letter and in any other aspect of the pre-employment process, the accuracy of your employment application and resume, and the accuracy in all material respects of your personal background information supplied to the Company;

    (b) Your successful completion of all facets of the Company's pre-employment screening process which includes, without limitation, a screening test for illegal drugs and controlled substances, confirmation that you are legally able to work for the Company in the United States in the position offered to you, and the Company's receipt of satisfactory references; and

    (c) Your satisfactory completion of the background investigation referred to below.

11. If you accept this offer:

    (a) You must schedule a screening test for illegal drugs and controlled substances at least three days before your start date.  You may do so by calling Alison Balter at 212-538-3421 after your acceptance of this offer;

    (b) On your start date, you must report to new hire orientation.  At this session you will receive further information about the various policies employees are required to adhere to at the Company and will be asked to sign various documents relating to these policies.  In addition, you will be asked to complete a personal data sheet that requires you to provide a complete employment and educational history for the past ten years.  Please arrive with this information.  A background investigation will be conducted which must verify the information you provide in the personal data sheet, your application, and your resume; and

    (c) In order to comply with U.S. law, all persons employed by the Company in the United States must provide evidence of their identity and right to work in the United States within three (3) days of their start date with the Company.  Please review the attached list of acceptable documentation and bring the appropriate document or documents to your orientation.

12. This letter shall be interpreted in accordance with the laws of the State of New York (without regard to the conflicts of laws principles thereof).

13. This letter represents the entire agreement between you and the Company regarding your employment with the Company and supersedes any and all previous and contemporaneous agreements and representations, written or oral.  This letter may not be changed or terminated except in writing signed by the parties.

We look forward to your joining the Company.  If you have any questions regarding the above, please feel free to call me or Alison Balter at 212-538-3421.

0987 – 1409

Please confirm your acceptance of the foregoing by signing and dating this letter agreement in the area designated below and returning it to Alison Balter at 11 Madison Avenue New York, NY 10010 no later than July 19, 2006. We will be unable to hold the offer open beyond this date. Please retain the additional copy of this offer letter for your reference.

Yours sincerely,

Jenny Mierau, Director

Agreed to and accepted:

Anne Dietrich                    Date

0987 – 1410

EXHIBIT F

MANDARIN ORIENTAL
SAN FRANCISCO

JOHN L. SULLIVAN
29 LLOYDEN DRIVE
ATHERTON 94027

1998 - 700
1997 - 780

ASSETS $39mm

COMPLIANCE SETTLEMENT BY FIRM
FOR $100,000

In residence at Mandarin Oriental, San Francisco
Mandarin Oriental, 222 Sansome Street, San Francisco, California 94104-2792, USA
Telephone (415) 276 9888. Facsimile (415) 433 0289.
E-mail: sfo-reservations@mosfo.com
http://www.mandarin-oriental.com

A Mandarin Oriental Hotel

EXHIBIT G



CREDIT SUISSE

## CREDIT SUISSE

## EMPLOYMENT DISPUTE RESOLUTION PROGRAM (UNITED STATES)
### (as amended as of October 9, 2002)

### The Program

The Credit Suisse Employment Dispute Resolution Program (the "Program") is a three-step program of dispute resolution procedures. It is designed to provide employees located in the United States with an opportunity to resolve employment-related claims in a speedy, cost-effective, and confidential manner.

The three steps of the Program are an internal grievance procedure; mediation with a neutral third party; and final and binding arbitration before a neutral third party. These procedures are, and since January 1, 1998, have been, the only means by which Credit Suisse employees located in the United States are able to seek resolution of employment-related claims of the type covered by the Program. They may not sue in court as to these claims.

Credit Suisse is also required to bring any claims it may have against employees located in the U.S. under the Program if the claims are of the type covered by the Program.

As used herein, "Credit Suisse" means the Credit Suisse Business Unit, including each of its past, present, and future legal entities, and its and their past, present and future directors, officers, and employees, in both their personal and their institutional capacities, and "employee" refers to both former employees and current employees and to applicants for employment.

### The Types of Claims That Are Covered

All present and future claims against Credit Suisse by an employee, and all present and future claims against an employee by Credit Suisse, are covered by the Program if: (i) they relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing, and (ii) they assert the violation or infringement of a legally protected right. Claims covered by the Program include, without limitation:

* All employment-related claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Equal Pay Act, the Americans with Disabilities Act, the Employee Retirement Income Security Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Family and Medical Leave Act, the Workers Adjustment and Retraining Notification Act, or any other federal, state, or local statute, ordinance, regulation, or common law rule or decision regarding employment discrimination, civil rights, human rights, whistleblower/public policy protection, conditions of employment, or termination (including manner or notice of termination) of employment, as the foregoing may from time to time be amended. State and local laws that are covered by the foregoing references include, without limitation, the laws of

1

New York, California, Illinois, Texas, Florida, Georgia, Massachusetts, Maryland, New Jersey, Pennsylvania, and Washington, D.C. and any other state or any locality where Credit Suisse has, had, or may at any time have an office; and

- All claims of breach of a contract entered into or alleged to have been entered into in connection with an employee's employment, all claims asserted under the Credit Suisse Group International Share Plan or any other equity or deferred compensation plan or any employee investment plan, and all employment-related claims for indemnification.

The only types of employment-related claims that are not covered by the Program are:

- Claims arising under the National Labor Relations Act, claims for workers' compensation, and claims for unemployment benefits. These will continue to be handled in accordance with applicable law.

- Claims for injunctive relief, including, without limitation, claims for injunctive relief brought in connection with allegations of unfair competition or the improper use of trade secrets or confidential or proprietary information, and claims to enforce the terms of an agreement or covenant relating to non-competition, non-solicitation, nondisclosure, or confidentiality, whether brought by an employee or by Credit Suisse. Employees and Credit Suisse will be able to assert such claims for injunctive relief in court to the extent necessary to determine whether such relief should be granted. No judicial proceeding initiated by a party in respect of an employment-related dispute in accordance with this paragraph shall be deemed a waiver of or incompatible with such party's right and obligation to seek final resolution of the subject matter of such dispute pursuant to the mediation and arbitration provisions of the Program.

Claims of the type covered by the Program, as described above, are hereafter referred to as "Employment-Related Claims."

## Other Important Information

- Credit Suisse personnel are specifically prohibited from taking any retaliatory action against an employee who has sought to use the Program. Violations of this rule will be treated with the utmost seriousness. Any employee who believes that he or she has been retaliated against for using the Program should immediately notify the Human Resources Department or the Legal and Compliance Department.

- Adoption of the Program and an employee's use of the Program will not affect an employee's status as an at-will employee, and will not limit Credit Suisse's ability to take disciplinary or other personnel action against the employee. If an employee believes he or she has an Employment-Related Claim against Credit Suisse as a result of its taking any such action, the employee may institute proceedings under the Program, but may not sue in court.

- Credit Suisse reserves the right to amend or repeal the Program at any time, upon notice. No such amendment or repeal will affect the applicability of the Program to Employment-Related Claims that arose before the effective date of the amendment or repeal.

- Establishment of the Program does not affect an employee's right to pursue, in accordance with applicable law, any administrative agency process that may be available to the employee.

2

- An employee who is (or is required to be) a registered representative shall be subject to the arbitration provisions of the Program with regard to an Employment-Related Claim asserted by him or her except to the extent he or she is legally required to arbitrate such Employment-Related Claim pursuant to particular rules or in a particular forum (for example, pursuant to the rules of or at a stock exchange or the National Association of Securities Dealers) to the exclusion of all other rules and forums. If such a requirement applies, it will take precedence over the arbitration procedure described in Step Three of the Program. Registered representatives will in all events be subject to the Program requirements regarding the internal grievance procedure (Step One) and mediation (Step Two), including the requirement that they seek resolution of Employment-Related Claims pursuant to those procedures, in accordance with the Program, before proceeding to arbitration. An employee who is not (and is not required to be) a registered representative shall be subject to all provisions of the Program with regard to an Employment-Related Claim asserted by him or her, including the requirements that an arbitrator be selected, and the arbitration of an Employment-Related Claim be conducted, through the auspices of and in accordance with the rules and procedures of identified service providers. Such an employee shall not be permitted to use any other forum, including that of a stock exchange or the National Association of Securities Dealers, for the arbitration of an Employment-Related Claim.

- If any provision of the Program is for any reason found by any court to be invalid or unenforceable, such judgment shall not affect, impair, or invalidate the remaining provisions of the Program, but shall be confined and limited to the provision of the Program directly involved in the controversy in which such judgment was rendered.

- Credit Suisse is committed to the principles of alternative dispute resolution set forth in the Program and to the early resolution of employment disputes. In individual circumstances, it may deviate from the Program's provisions and procedures in order to promote these principles and benefit employees. Credit Suisse's doing so shall not constitute or be construed as a waiver by Credit Suisse of its right to require adherence to the Program's provisions or of the enforceability of the Program.

## The Three Steps

Step One of the Program is the internal grievance procedure. Step Two is mediation before a neutral third party. Step Three is final and binding arbitration before a neutral third party. The three steps must be taken in sequence. The procedures an employee must follow to initiate each of the three steps and the manner in which proceedings pursuant to each step are be conducted are explained below.

## Step One - Internal Grievance Procedure

If an employee believes he or she may have an Employment-Related Claim against Credit Suisse, the employee should first, and as promptly as possible, bring the problem to the attention of an appropriate person at Credit Suisse. Generally an employee's supervisor will be in the best position to understand and resolve a problem because he or she is most likely to be familiar with the employee's working situation and to know the other personnel in the employee's department. The first person an employee speaks to should therefore usually be his or her supervisor. If an employee does not feel comfortable speaking to his or her supervisor (because, for example, he or she believes the supervisor is part of the problem), he or she should take the issue to the supervisor's supervisor or to another appropriate person above the supervisor in the department's

chain of command. Instead of directly approaching a supervisor, an employee may also, at any point in the process, contact his or her Human Resources representative to discuss the issue. Supervisors with whom issues are raised should contact their Human Resources representatives for assistance in resolving such issues.

If Credit Suisse believes it has an Employment-Related Claim against an employee, it will bring the issue to the attention of the employee and seek to resolve the claim through discussions with the employee or his or her representative before proceeding to Step Two of the Program.

As a matter of Credit Suisse policy, all employment-related issues that are raised in connection with the foregoing dispute resolution procedure are to be handled confidentially to the extent reasonably practicable under the circumstances. Often the matter can be dealt with by a supervisor without his or her bringing anyone else (other than, in appropriate cases, a member of the Human Resources Department) into the discussions. At other times it may be necessary that another manager or other employees be consulted in order to resolve the matter. All supervisors, managers, and other employees are specifically prohibited from taking any retaliatory action against an employee who has raised an Employment-Related Claim and sought to utilize the foregoing procedure or any of the other dispute resolution procedures set out in the Program. Step One of the Program may be used not only in connection with Employment-Related Claims but also in connection with any other employment-related grievances an employee may have.

## *Step Two - External Mediation*

If an employee or Credit Suisse raised an Employment-Related Claim through the Step One internal grievance procedure and believes the dispute was not satisfactorily resolved through that procedure, he or she or it may elect to proceed to Step Two. Step Two consists of the mediation of an Employment-Related Claim by a neutral third party. To elect to proceed to mediation, an employee or Credit Suisse must make a request for mediation in the manner described below. Each may also request mediation of an Employment-Related Claim asserted by the other. An employee or Credit Suisse may request mediation <u>only</u> in respect of an, Employment Related Claim,, as that term is defined above.

### What Mediation Is

In mediation, the parties (and, if they so choose, their attorneys) meet in a confidential setting with a neutral third party, the mediator. The mediator encourages the parties to discuss their differences and assists them in developing a resolution that is satisfactory to each of them. If the parties are able to resolve their dispute through the mediation process, they typically set forth the terms of their agreement in a legally binding writing.

Mediation is widely considered a much more effective and appropriate means than litigation for resolving employment-related disputes. The proceedings are private, confidential, and flexible. If the dispute is resolved, the resolution is not one that was imposed on the parties but rather is one both parties played a part in designing and to which they both agreed. Often the parties are able to resume an amicable relationship after the resolution is achieved.

### Conduct of Mediation

All mediations pursuant to the Program will be conducted by a single mediator supplied by JAMS, an independent provider of dispute resolution services. The mediator will be experienced in resolving disputes involving employment issues.

### Making a Request for Mediation

To make a request for mediation of an Employment-Related Claim under the Program, an employee or Credit Suisse, as the case may be, must submit a written request to the other (to the attention of the employee's Human Resources representative in the case of a request made by an employee) and to JAMS and pay a filing fee of $150 to JAMS. Employees may obtain a copy of the request form from the Human Resources Department.

Time Period for Making Request

A request for mediation under the Program must be filed within six months of the time that the complained of action or actions took place, or during such longer period as is allowed by any statute of limitations applicable to the Employment-Related Claim in question. If an employee or Credit Suisse does not file a request for mediation within the required period, he or she or it will forfeit any further right to make use of the Program and will be foreclosed from bringing an action in any court on the Employment-Related Claim.

### Step Three - Final, Binding Arbitration

It is Credit Suisse's expectation that most Employment-Related Claims will be resolved through Step One or Step Two. If, however, an employee or Credit Suisse has made an effort to resolve such a claim through mediation in accordance with Step Two but the mediation proceedings did not result in a resolution, he or she or it may proceed to Step Three, final and binding arbitration. To elect to proceed to arbitration, the employee or Credit Suisse must make a request for arbitration in the manner described below. Final, binding arbitration will be an employee's and Credit Suisse's exclusive remedy for resolving an Employment-Related Claim that was mediated unsuccessfully. Both the employee and Credit Suisse will be bound by any decision rendered by an arbitrator pursuant to Step Three, whether in respect of a claim asserted by an employee or in respect of a claim asserted by Credit Suisse, subject to the right to seek judicial review of the decision in accordance with applicable law.

What Final, Binding Arbitration Is

Final, binding arbitration is a process in which a dispute is presented to a neutral third party, the arbitrator, for a final and binding decision. The arbitrator renders a decision after considering the evidence and arguments presented by both parties.

Arbitration is less formal than a court trial and generally is quicker. It is, however, an orderly proceeding, governed by rules of procedure and legal standards of conduct. Each party has the right to at least a minimum amount of discovery, to present his or her proof, through testimony and documentary evidence, and to cross-examine the other party's witnesses. The arbitrator's decision is legally enforceable. In other words, the party to whom relief is granted may, if the other party does not comply with the terms of the award, sue in court to enforce the award.

Conduct of Arbitration

All arbitrations under the Program will be conducted by a single arbitrator supplied by JAMS, the American Arbitration Association, or the Center for Public Resources (CPR) Institute for Dispute Resolution ( Service Providers,). The arbitrator will be selected, and the arbitration proceeding will be conducted, in accordance with the rules and procedures of such Service Provider applicable to the arbitration of employment disputes (the, Employment Arbitration Rules, of such entity), as such rules and procedures are then in effect. JAMS, the American Arbitration Association, and CPR Institute for Dispute Resolution are all independent, experienced providers of arbitration services. The party that first requests an arbitration will choose which of the three Service Providers will be

used for the proceeding. Copies of the three Service Providers' current Employment Arbitration Rules are available from the Human Resources Department.

<u>Making a Request for Arbitration</u>

To make a request for arbitration of an Employment-Related Claim under the Program, an employee or Credit Suisse, as the case may be, must submit a written request to the other (to the attention of the employee's Human Resources representative in the case of a request made by an employee) and to the Service Provider he or she or it has selected. No filing fee in addition to the filing fee of $150 payment of which was required in order to initiate the mediation of such claim under the Program is required to be paid to commence an arbitration. Employees may obtain a copy of the request form from the Human Resources Department.

<u>Time Period for Making Request</u>

A request for arbitration under the Program must be filed within six months of the time that the complained of action or actions took place, or during such longer period as is allowed by any statute of limitations applicable to the Employment-Related Claim in question. The time that elapses from when a request for mediation is filed pursuant to Step Two of the Program until two weeks after the employee gives Credit Suisse written notice, or Credit Suisse gives the employee written notice, that, in such party's view, the mediation proceedings are not likely to result in a resolution will not be counted in calculating the time remaining in the applicable period. If an employee or Credit Suisse does not file his or her or its request for arbitration within the required period, he or she or it will forfeit any further right to make use of the Program and will be foreclosed from bringing an action in any court with respect to the Employment-Related Claim.

## <u>*Additional Mediation and Arbitration Rules and Procedures*</u>

The following additional rules and procedures will apply to any mediation or arbitration under the Program, whether initiated by an employee or by Credit Suisse:

1.  <u>Representation by Counsel</u>. An employee as well as Credit Suisse will have the right to be represented by counsel. Each will be responsible for paying the fees and disbursements of his or her or its own counsel, unless otherwise directed by an arbitrator pursuant to his or her authority referred to in paragraph 6 below.

2.  <u>The Mediator or Arbitrator</u>. The mediator or arbitrator will be experienced in employment law and will be neutral and impartial. Any mediator or arbitrator will be selected by agreement of the employee and Credit Suisse from a panel provided by the mediation or arbitration service. If the employee and Credit Suisse cannot agree on a mediator or arbitrator, the service provider will make the selection in accordance with its procedures as then in effect.

3.  <u>Expenses</u>. There will be various expenses associated with a mediation or arbitration, such as the mediator's or arbitrator's daily fees and travel expenses. In the case of a proceeding under the Program initiated by an employee, the employee will, as noted above, be responsible for an initial filing fee of $150, payable prior to commencement of Step Two (mediation). Credit Suisse will, with the employee's consent, bear all of such expenses of the mediator, or of the arbitrator in any subsequent, related arbitration, that are in excess of the initial filing fee. Each party will be responsible for the fees and disbursements of his or her or its own counsel and the expenses relating to the production of witnesses or other evidence by him or her or it, subject to the authority of the arbitrator set forth in paragraph 6 below.

4.    <u>Location of a Mediation or Arbitration</u>.  Any mediation or arbitration will be held in the New York City metropolitan area or, at the request of the party initiating the proceeding and with the consent of the other party, in the location of the Credit Suisse office where the employee applied for a position or works or worked when the complained of action or actions took place.  If a proceeding initiated by an employee in respect of an Employment-Related Claim asserted by him or her takes place other than in the location of the office where the employee applied for a position or works or worked when the complained of action or actions took place, Credit Suisse will reimburse the reasonable expenses of the employee and any witnesses produced by him or her in an arbitration for their expenses incurred in connection with traveling to the site of the proceeding.

5.    <u>Governing Law</u>.  The law applied by a mediator or arbitrator will be the laws of the State of New York, without regard for the conflicts of laws principles thereof.

6.    <u>Authority of Arbitrator</u>.  In the case of an arbitration, the arbitrator's authority will be limited to the resolution of legal disputes between the employee and Credit Suisse.  The arbitrator will be bound by and will be required to apply all applicable law, including that relating to the allocation of the burden of proof and remedies (including any award of attorney's fees) for violations of such law, if any, as well as all points of substantive law.  He or she will have no authority either to abridge or to enlarge substantive rights available under existing law.

7.    <u>Arbitrator's Decision in Writing</u>.  The arbitrator will be required to render a written award that identifies the parties, summarizes the issues in controversy, and sets forth the decision of the arbitrator and the factual and legal bases for the decision.

EXHIBIT H

## AGREEMENT TO USE
## EMPLOYEE DISPUTE RESOLUTION PROGRAM PROCEDURES

~HSL

1. I confirm that I have received and have carefully read the Statement of Policy regarding the Credit Suisse First Boston Employment Dispute Resolution Program (the "Program").

2. I agree that I will submit all claims I may from time to time have against Credit Suisse First Boston (including each of its past, present, and future legal entities, and its and their past, present, and future directors, officers, and employees in both their individual and their institutional capacities) ("Credit Suisse First Boston) that relate to or arise from my employment or termination (including manner of termination) of employment, excluding only claims for workers' compensation and claims for unemployment benefits, to and in accordance with the dispute resolution procedures under the Program. I understand that the types of claims I am hereby agreeing to submit to the Program include, without limitation, all employment-related claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Equal Pay Act, the Americas with Disabilities Act, the Employee Retirement Income Security Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Family and Medical Leave Act, or any other federal, state, or local statute, ordinance, regulation or common law rule or decision regarding employment discrimination, civil rights, human rights, conditions of employment, or termination (including manner of termination) of employment, as the foregoing may form time to time be amended.  State and local laws that are covered include, also without limitation, the laws of New York, California, Illinois, Texas, Florida, Georgia, Massachusetts, Pennsylvania, and any other state or any locality where Credit Suisse First Boston has, had, or may at any time have an office.

3. The term "Employment-Related Claim" is used herein to refer to all claims of the type that are covered by the Program.

4. I understand that my employment by Credit Suisse First Boston is expressly conditioned on my entering into this Agreement.

5. I acknowledge that under the Program I am required to file any request for mediation or arbitration of an Employment-Related Claim within a prescribed period, and that, if I do not file my request within that time period, I will forfeit any further rights I might have to make use of the Program and will not be able to sue in court on the claim.

6. I understand that, to the fullest extent permitted by law, I will be barred from bringing any action or proceeding in any federal, state, or local court relating in any way to an Employment-Related Claim (provided that I shall have the right to sue to enforce an arbitrator's award made in connection with Step Three of the Program).

_____
Signature

JOHN L. SULLIVAN II
_____
Print Name

8/9/01
Date

589 1654

Employee ID#

**RETURN TO JANICE MARIE PROVETTI, EMA - 7**

EXHIBIT I

**CREDIT SUISSE**
**EMPLOYMENT DISPUTE RESOLUTION PROGRAM**

### Request for Mediation

1. Credit Suisse Securities (USA) LLC ( Credit Suisse,) believes that it has an Employment Related Claim, as that term is defined in the Credit Suisse Dispute Resolution Program (the "Program"), against a former employee, John L. Sullivan II.

2. The following is a description of the Employment Related Claim Credit Suisse believes it has against John L. Sullivan II:

   Credit Suisse claims that John L. Sullivan II violated contractual obligations and fiduciary duties in connection with his resignation from Credit Suisse and subsequent conduct.

3. The relief Credit Suisse is seeking is as follows:  A mediation by a neutral third party experienced in resolving disputes involving employment issues.

4. By sending a copy of this Request Form to John L. Sullivan II and to JAMS/Endispute (Att'n Nildania Perez, Field Supervisor, 45 Broadway, 28th Floor, New York NY 10006; Tel.: 800-352-5267 or 212-751-2700; Fax: 212-751-4099), Credit Suisse is requesting that its claim against John L. Sullivan II be mediated in accordance with the procedures described in the Program.

5. Credit Suisse's check in the amount of $150 accompanies the copy of this Request Form Credit Suisse is sending to JAMS/Endispute.  This amount represents the filing fee payable by Credit Suisse in respect of the mediation it is requesting.

6. The entire mediation process will be confidential.  No offers, settlement proposals and confidential statements to the mediator, whether oral or written, made during the mediation by John L. Sullivan II, his representative (if applicable), the Credit Suisse representatives or the mediator (or the mediator's agents, employees, experts and attorneys) will or may be disclosed to third parties or used in arbitration.  However, information that would otherwise be usable in an arbitration will remain usable in the arbitration, even if that information has been discussed or shared in the mediation.

_Alexander Barnard_
(Sign Name)

Director and Counsel
Title

 Alexander C.B. Barnard
(Print Name)

 October 3, 2007
Date of Request

 (212) 325-2000
Telephone Number

# Demand for Arbitration Before JAMS

**JAMS**

THE RESOLUTION EXPERTS®

## Instructions for Submittal of Arbitration to JAMS

### Demand for Arbitration Based on Pre-Dispute Provision

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS:

A. Two (2) copies of the **Demand for Arbitration**

B. **Proof of service** of the Demand on the appropriate party
   E.g., copy of certified mail receipt signed by recipient or sworn statement of service by a non-party over 18 years of age.

C. **Two (2) copies of the entire contract containing the arbitration clause**

D. **Initial non-refundable $300.00 Case Management Fee (CMF) per party**
   Each party may submit its own CMF, or to expedite the commencement of the proceedings one party may elect to submit both or all CMF's. In lengthier, more complex cases additional Case Management fees may be billed. For cases involving consumers, see JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses.

### OR

### Arbitration Based on Post-Dispute Fully Executed Arbitration Agreement, Oral Stipulation or Court Order Compelling Arbitration

Whether or not a certain arbitrator has been designated, if the parties have agreed to arbitrate at JAMS or the court has ordered that the parties arbitrate at JAMS, kindly forward the following items to JAMS:

A. Two (2) copies of **Executed Arbitration Agreement OR Court Order appointing arbitrator/JAMS**
   Please contact JAMS to obtain the appropriate form (e.g., Arbitration Agreement)

B. Two (2) copies of the **entire contract, if any, containing an applicable arbitration clause**

C. **Initial non-refundable $300.00 Case Management Fee (CMF) per party**
   Each party may submit its own CMF, or to expedite the commencement of the proceedings one party may elect to submit both or all CMF's. In lengthier, more complex cases additional Case Management fees may be billed. For cases involving consumers, see JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses.

**Please submit to your local JAMS office.**

Once the above items are received, JAMS will contact all parties to commence the arbitration process, including the appointment of an arbitrator and scheduling of a hearing date.



THE RESOLUTION EXPERTS®

# Demand for Arbitration
# Before JAMS

## TO RESPONDENT: John L. Sullivan II

(Name of the Party on whom Demand for Arbitration is made)

(Address) 29 Lloyden Drive

(City) Atherton          (State) CA          (Zip) 94027

(Telephone)          (Fax)          (E-Mail)

Representative/Attorney (if known):

(Name of the Representative/Attorney of the Party on whom Demand for Arbitration is made)

(Address)

(City)          (State)          (Zip)

(Telephone)          (Fax)          (E-Mail)

## FROM CLAIMANT (Name): Credit Suisse Securities (USA) LLC

(Address) 11 Madison Avenue

(City) New York          (State) New York          (Zip) 10010

(Telephone) (212) 325-2000          (Fax)          (E-Mail)

Representative/Attorney of Claimant (if known): Alexander C.B. Barnard

(Name of the Representative/Attorney for the Party Demanding Arbitration)

(Address) Credit Suisse Securities (USA) LLC

(City) New York          (State) New York          (Zip) 10010

(Telephone) (212) 325-2000          (Fax)          (E-Mail) (see below)

## NATURE OF DISPUTE

Claimant hereby demands that you submit the following dispute to final and binding arbitration (a more detailed statement of the claim(s) may be attached): EMAIL: alexander.barnard@credit-suisse.com]. Respondent was an employee of Claimant as of September 27, 2007, when he abruptly purported to resign and began aggressively soliciting Claimant's clients in violation of an agreement under which he promised to provide Claimant with 60 days' notice of his intent to resign and, for an additional 30 days after effective termination, to refrain from competing with Claimant's clients and employees, and for an additional 60 days after effective termination, to

GL590/1949574.1

Updated 1/15/05
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2005 JAMS. All rights reserved.



THE RESOLUTION EXPERTS®

# Demand for Arbitration
# Before JAMS

refrain from soliciting Claimant's clients and employees. Such conduct is in violation of numerous contractual provisions as well as Respondent's fiduciary duties to Claimant.

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows (cite location of arbitration provision & attach two (2) copies of entire agreement).

## CLAIM & RELIEF SOUGHT BY CLAIMANT

Claimant asserts the following claim and seeks the following relief (include amount in controversy, if applicable): Claimant asserts claims for: breach of contract, breach of fiduciary duty, and interference with contractual relations. Claimant reserves the right to assert additional claims. Claimant seeks injunctive relief and damages.

## RESPONSE

Respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. Send the original response and counter-claim to the claimant at the address stated above with two (2) copies to JAMS.

## Request for Hearing

JAMS is requested to set this matter for hearing at:

New York, New York

_____
(Preferred Hearing Location)

GL590/1949574.1

- 3 -



# Demand for Arbitration
# Before JAMS

THE RESOLUTION EXPERTS®

Signed (Claimant): _Alexander Barnard_ Date: October 3, 2007
(may be signed by an attorney)

Print Name: Alexander C.B. Barnard

**Please include a check payable to JAMS for the required initial, non-refundable $300.00 per party deposit to be applied toward your case management fee and submit to your local JAMS office.**

Updated 1/15/05
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2005 JAMS. All rights reserved.

# CREDIT SUISSE

**CREDIT SUISSE SECURITIES (USA) LLC**
One Madison Avenue                    Tel        1 212 325 2000
New York, NY 10010-3629                www.credit-suisse.com

October 16, 2007

**VIA E-MAIL and FACSIMILE: 212-785-9099**

Anthony Paduano
Paduano & Weintraub
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020

Re:     *Credit Suisse v. Sullivan*, 07-CV-8556

Dear Mr. Paduano:

As you know, in light of your client's conduct surrounding his purported resignation from Credit Suisse and his apparent violations of his contractual obligations and fiduciary duties, Credit Suisse has initiated arbitration in JAMS. Based on recently-obtained evidence, Credit Suisse is now amending its arbitration papers to assert additional claims against your client. We enclose a copy of the amended arbitration papers along with a courtesy copy of the original papers herewith.

Please be advised that Credit Suisse will be filing today a motion by order to show cause for a temporary restraining order and preliminary injunction in aid of the JAMS arbitration in the Southern District of New York. If you wish to be heard in connection with this motion, please contact me.

Very truly yours,

Alexander C.B. Barnard

Enclosure



# Demand for Arbitration
# Before JAMS

**THE RESOLUTION EXPERTS®**

---

## Instructions for Submittal of Arbitration to JAMS

**Demand for Arbitration Based on Pre-Dispute Provision**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS:

    A. Two (2) copies of the **Demand for Arbitration**

    B. **Proof of service** of the Demand on the appropriate party
       E.g., copy of certified mail receipt signed by recipient or sworn statement of service by a
       non-party over 18 years of age.

    C. **Two (2) copies of the entire contract containing the arbitration clause**

    D. **Initial non-refundable $300.00 Case Management Fee (CMF) per party**
       Each party may submit its own CMF, or to expedite the commencement of the proceedings
       one party may elect to submit both or all CMF's.  In lengthier, more complex cases additional
       Case Management fees may be billed.  For cases involving consumers, see JAMS Policy on
       Consumer Arbitrations Pursuant to Pre-Dispute Clauses.

### OR

**Arbitration Based on Post-Dispute Fully Executed Arbitration Agreement, Oral Stipulation**

**or Court Order Compelling Arbitration**

Whether or not a certain arbitrator has been designated, if the parties have agreed to arbitrate at JAMS or the court has ordered that the parties arbitrate at JAMS, kindly forward the following items to JAMS:

    A. Two (2) copies of **Executed Arbitration Agreement OR Court Order appointing
       arbitrator/JAMS**
       Please contact JAMS to obtain the appropriate form (e.g., Arbitration Agreement)

    B. Two (2) copies of the **entire contract, if any, containing an applicable arbitration clause**

    C. **Initial non-refundable $300.00 Case Management Fee (CMF) per party**
       Each party may submit its own CMF, or to expedite the commencement of the proceedings
       one party may elect to submit both or all CMF's.  In lengthier, more complex cases additional
       Case Management fees may be billed.  For cases involving consumers, see JAMS Policy on
       Consumer Arbitrations Pursuant to Pre-Dispute Clauses.

**Please submit to your local JAMS office.**

Once the above items are received, JAMS will contact all parties to commence the arbitration process, including the appointment of an arbitrator and scheduling of a hearing date.

GL590/1949574.1 Updated 1/15/05

(c) copyright 2005 JAMS. All rights reserved.



**THE RESOLUTION EXPERTS®**

# Demand for Arbitration
# Before JAMS

## TO RESPONDENT: John L. Sullivan II
<small>(Name of the Party on whom Demand for Arbitration is made)</small>

(Address) 29 Lloyden Drive

| (City) Atherton | (State) CA | (Zip) 94027 |
|---|---|---|
| (Telephone) | (Fax) | (E-Mail) |

Representative/Attorney (if known): Anthony Paduano
<small>(Name of the Representative/Attorney of the Party on whom Demand for Arbitration is made)</small>

(Address) Paduano & Weintraub, 1251 Avenue of the Americas, Ninth Floor

| (City) New York | (State) New York | (Zip) 10020 |
|---|---|---|
| (Telephone) 212-785-9100 | (Fax) 212-785-9099 | (E-Mail) |

## FROM CLAIMANT (Name): Credit Suisse Securities (USA) LLC

(Address) 11 Madison Avenue

| (City) New York | (State) New York | (Zip) 10010 |
|---|---|---|
| (Telephone) (212) 325-2000 | (Fax) | (E-Mail) |

Representative/Attorney of Claimant (if known): Alexander C.B. Barnard
<small>(Name of the Representative/Attorney for the Party Demanding Arbitration)</small>

(Address) Credit Suisse Securities (USA) LLC

| (City) New York | (State) New York | (Zip) 10010 |
|---|---|---|
| (Telephone) (212) 325-2000 | (Fax) | (E-Mail) (see below) |

## NATURE OF DISPUTE

Claimant hereby demands that you submit the following dispute to final and binding arbitration (a more detailed statement of the claim(s) may be attached): EMAIL: alexander.barnard@credit-suisse.com]. AMENDED DEMAND FOR ARBITRATION. This Demand amends the Demand for Arbitration filed by Claimant against Respondent on October 3, 2007.

Respondent was an employee of Claimant as of September 27, 2007, when he abruptly purported to resign and began aggressively soliciting Claimant's clients in violation of an

GL590/1949574.1

Updated 1/15/05
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2005 JAMS. All rights reserved.



**THE RESOLUTION EXPERTS®**

# Demand for Arbitration
# Before JAMS

agreement under which he promised to provide Claimant with 60 days' notice of his intent to resign and, for an additional 30 days after effective termination, to refrain from competing with Claimant's clients and employees, and for an additional 60 days after effective termination, to refrain from soliciting Claimant's clients and employees. In addition, Credit Suisse has discovered that, shortly before Respondent purported to resign from Credit Suisse, he (and those acting on his behalf) took Credit Suisse's confidential and proprietary information. Such conduct is in violation of numerous contractual provisions as well as Respondent's fiduciary duties to Claimant.

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows (cite location of arbitration provision & attach two (2) copies of entire agreement).

## CLAIM & RELIEF SOUGHT BY CLAIMANT
Claimant asserts the following claim and seeks the following relief (include amount in controversy, if applicable): Claimant asserts claims for: breach of contract, breach of fiduciary duty, misappropriation of trade secrets, conversion, unfair competition, and tortious interence with contractual relations. Claimant reserves the right to assert additional claims. Claimant seeks injunctive relief and damages.

## RESPONSE
Respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. Send the original response and counter-claim to the claimant at the address stated above with two (2) copies to JAMS.

Updated 1/15/05
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2005 JAMS. All rights reserved.



**THE RESOLUTION EXPERTS®**

# Demand for Arbitration
# Before JAMS

## Request for Hearing

JAMS is requested to set this matter for hearing at: <u>New York, New York</u>

(Preferred Hearing Location)

Signed (Claimant): *Alexander Barnard* Date: October 16, 2007

(may be signed by an attorney)

Print Name: Alexander C.B. Barnard

**Please include a check payable to JAMS for the required initial, non-refundable $300.00 per party deposit to be applied toward your case management fee and submit to your local JAMS office.**

Updated 1/15/05
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2005 JAMS. All rights reserved.